1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    CENTRAL DISTRICT OF CALIFORNIA

8

9    SAM JACOBSON,                    )  CASE NO. CV 09-09377 MMM (FMOx)
                                      )
10            Plaintiff,              )
                                      )
11        vs.                         )  ORDER GRANTING IN PART AND
                                      )  DENYING IN PART DEFENDANT'S
12   CARLTON HAIR; and REGIS          )  MOTION FOR PARTIAL SUMMARY
     CORPORATION,                     )  JUDGMENT
13                                    )
              Defendants.             )
14                                    )
                                      )
15                                    )
                                      )
16   _____ )

17        On November 10, 2009, plaintiff Sam Jacobson commenced this action in Los Angeles

18   Superior Court.[1]  Defendant removed the case to this court on December 22, 2009, invoking the

19   court's diversity jurisdiction.[2]  On January 20, 2010, plaintiff filed a second amended complaint

20   against defendant Regis Corporation ("Regis") d/b/a Carlton Hair ("Carlton")[3] alleging six claims

21   _____

22        [1]Notice of Removal, Docket No. 1 (December 22, 2009), Exh. A (Complaint); Exh. B
     (First Amended Complaint).
23

24        [2]Notice of Removal at 1.

25        [3]The parties agree that Regis "operates hair salons throughout the United States. 'Carlton
     Hair' is one of several different salon brands operated by Regis and is an operating division of
26   Regis, not a separate corporation." (Statement of Uncontroverted Facts ("SUF"), Docket No. 52
     (November 8, 2010), ¶¶ 1-2; Statement of Genuine Issues ("SGI"), Docket No. 71 (December
27   13, 2010), ¶¶ 1-2).  As a result, the court will refer to a single defendant throughout this order.

28

related to his employment as a hair stylist at one of defendant's hair salons and his termination from that position: (1) breach of employment contract; (2) violations of the California Labor Code; (3) wrongful termination in violation of public policy; (4) violation of the Fair Employment and Housing Act ("FEHA") based on disability; (5) violation of FEHA based on ancestry or national origin; and (6) violation of the California Family Rights Act ("CFRA") and Family Medical Leave Act ("FMLA").[4]   On November 8, 2010, Regis moved for partial summary judgment on all of plaintiff's claims except portions of his fourth and fifth claims concerning to harassment on the basis of disability and national origin.[5]   Plaintiff has opposed the motion.[6]

# I.  FACTUAL BACKGROUND

## A.  Plaintiff's Employment with Carlton Hair

Regis operates hair salons throughout the United States, including thirty-one salons that

---

[4]Second Amended Complaint ("SAC"), Docket No. 16 (January 20, 2010).

[5]Motion for Summary Judgment ("Motion"), Docket No. 51 (November 8, 2010); Declaration of Hayley Macon ("Macon Decl."), Docket No. 55 (November 8, 2010); Declaration of Michelle O'Donnell ("O'Donnell Decl."), Docket No. 55 (November 8, 2010); Declaration of Meredith Trailor ("Trailor Decl."), Docket No. 55 (November 8, 2010); Declaration of Catherine Darce ("Darce Decl."), Docket No. 55 (November 8, 2010); Declaration of Jill Evans ("Evans Decl."), Docket No. 55 (November 8, 2010); Declaration of Barb Muellerleile ("Muellerleile Decl."), Docket No. 55 (November 8, 2010).

[6]Opposition ("Opp."), Docket No. 71 (December 13, 2010); Declaration of Carney Shegarian ("Shegarian Decl."), Docket No. 71 (December 13, 2010); Declaration of Sam Jacobson ("Jacboson Decl."), Docket No. 71 (December 13, 2010); Declaration of Craig Snyder, Ph.D. ("Snyder Decl."), Docket No. 71 (December 13, 2010); Notice of Filing of Complete Deposition Transcripts, Docket No. 71 (December 13, 2010).

On December 13, 2010, with his opposition to defendant's motion, plaintiff filed a request for dismissal of his second claim alleging violations of the California Labor Code. (Request for Dismissal, Docket No. 72 (December 13, 2010)).  Additionally, plaintiff did not provide argument regarding this claim in his opposition to the motion for summary judgment.  Consequently, the court dismisses plaintiff's second claim with prejudice and will not address defendant's arguments regarding the claim in this order.

operate under the name of "Carlton Hair" in California.[7] On April 26, 2006, plaintiff submitted an application for employment to Carlton.[8] He signed the application, which included a provision stating that:

> "I understand that this application is not a contract, offer or promise of employment and that if hired, I will be able to resign at any time for any reason. Likewise, Regis Corporation can terminate my employment at any time with or without cause. Furthermore, I understand that no person other than the President of Regis Corporation has the authority to enter into an employment contract with me and that any exception to my at-will relationship must be evidenced by a written agreement signed by me and the President of Regis Corporation."[9]

Plaintiff contends that during his initial interview with Salon Manager Rebecca Sanchez and Assistant Manager Meredith Trailor, he was told that "one of the reasons they [were glad he had] appl[ied] for the company [was because he] was older, and . . . because [they] like people to stay with the company for a very, very long time.'"[10] They further stated that they were "not interested in people that [were only] going to work for the company [for] a year or two and leave."[11] Sanchez and Trailor purportedly told plaintiff that, "[a]s long as [he] d[id] a good job,

---

[7]SUF, ¶¶ 1, 3; SGI, ¶¶ 1, 3.

[8]SUF, ¶ 5; SGI, ¶ 5.

[9]Macon Decl., Exh. B2 (Application for Employment) at 71. It is undisputed that plaintiff filled out and signed an application for employment and that the application contained this provision. It appears plaintiff disputes the materiality of the fact, however, because he alleges that he was told that he needed to sign the form because it was "legal stuff." He contends he was told: "You just have to sign it because everybody has to sign it. That's just the way it works, but we promise you, you have our word, as long as you do a good job, you will always have a job with Carlton." (Deposition of Sam Jacobson ("Jacobson Depo."), Docket No. 71 (December 13, 2010) at 33:3-7).

[10]*Id.* at 30:16-31:14.

[11]*Id.*

3

[he would] always, always have a job with [Carlton]."[12]  They also noted that "Carlton, in general, never fires people for no reason, and you will not get fired for no reason.  As long as you do a good job, you will always, always have a job with [Carlton]."[13]

On May 4, 2006, plaintiff was hired as an assistant hair stylist at the West Side Pavilion hair salon.[14]  Sanchez and Trailor, who had been actively involved in hiring plaintiff, were his supervisors.[15]  On the day he was hired, Regis contends that plaintiff received a New Employee Orientation Packet, containing, among other things, Regis' (1) Conflict of Interest policy; (2) disability policy; and (3) Non-Discrimination and Workplace Harassment policy.[16]  Plaintiff acknowledges that he received *some* of the materials in the orientation packet, but asserts that he did not receive all of the information because he was told defendant had run out of certain documents and he would receive them later.[17]  It is uncontested, however, that plaintiff filled out and signed a form stating "acknowledg[ing] that [he had] read and underst[oo]d the Non-Discrimination and Workplace Harassment Policy."[18]

It is likewise undisputed that plaintiff filled out and signed a Personnel Data Sheet with a provision that stated: "I further understand that no provision contained in 'Important Information for the New Employee' is intended to create a contract or guarantee of employment between Regis Corporation and any employee, or to limit the rights of the company and its employees to terminate the employment relationship at any time, for any reason in the company's sole

---

[12]*Id.*

[13]*Id.* at 31:21-25.

[14]SUF, ¶ 7; SGI, ¶ 7.

[15]SUF, ¶ 8; SGI, ¶ 8.

[16]SUF, ¶ 9; Trailor Decl., Exh. B (New Hire Orientation Packet).

[17]SGI, ¶ 9; Jacobson Depo. at 103:12-104:16.

[18]Macon Decl., Exh. B6 (Salon Policy Acknowledgment) at 79.  Plaintiff disputes whether defendant follows its non-discrimination policy, but does not appear to dispute that the signature acknowledging his receipt and understanding of the policy is his. (SGI, ¶ 13).

discretion."[19] Plaintiff also signed a Proprietary Information and Non Solicitation Agreement with a non-competition provision that stated: "I agree that during my employment with the Company, I shall not directly or indirectly, engage or attempt to engage in any competitive activity relating to the subject matter of my employment with the Company. . . . I agree that while I am employed by the Company, I will not compete with the Company in any way either on my own time or by working at a competitor company."[20]

In October 2006, plaintiff was promoted to the position of stylist.[21] As a stylist, his job duties included "adhering to Carlton Hair's customer-service standards," recommending and selling hair products to clients, and performing all tasks necessary to hair styling, including shampooing, cutting, blow drying, and styling hair.[22] Subsequent to plaintiff's promotion, Regis prepared to open a new salon in Century City. Trailor was tapped to be manager of the new salon and she "wanted a team of strong people."[23] She approached Jacobson and said: "Sam, you are one of the strongest people. You have built clients faster than anybody else. . . ."[24] On January 1, 2007, Jacobson transferred to Regis' Century City salon, where he was supervised by Trailor, as salon manager, and later by Katherine Armstrong, who had joined the store as the assistant

---

[19]Macon Decl., Exh. B3 (Personnel Data Sheet) at 73.

[20]Macon Decl., Exh. B4 (Proprietary Information and Non Solicitation Agreement) at 75-77.

[21]The parties appear to dispute the date upon which plaintiff was promoted. Plaintiff contends he received the promotion on October 1, 2006, while defendant contends he was promoted on October 23, 2006. (See SUF, ¶ 17; SGI, ¶ 17). As the date of the promotion is immaterial to resolution of the motion, the court need not resolve this factual dispute.

[22]SUF, ¶ 18; SGI, ¶ 18. Plaintiff suggests that this fact is disputed as he contends his job functions also included selling "expensive and useless products to his clients." (SGI, ¶ 17). Plaintiff does not appear to dispute, however, that he was tasked with the functions listed in the text.

[23]Jacobson Depo. at 56:12-17.

[24]*Id.*

manager, as well.[25]

Stylists are required to take continuing education classes every year to renew their licenses.[26] Carlton Hair also expects its stylists to be "knowledgeable regarding current trends and techniques in the hair-styling business. To facilitate this effort, Carton Hair offers [additional] technique and styling classes that its employees may take."[27] Plaintiff contends that the classes were mandatory and that stylists were required to pay for them out of their wages.[28] He asserts that he told his supervisors he did not want to take the classes "because they were so expensive and because [he] did not believe [he] was benefitting from them."[29] He also maintains that he

---

[25]SUF, ¶ 26; SGI, ¶ 26.

[26]Jacobson Depo. at 140:10-16.

[27]O'Donnell Decl., ¶ 3.

[28]Jacobson Decl., ¶¶ 10-11.

[29]*Id.*, ¶ 10; Jacobson Depo. at 117:14-25. In addition to his declaration and deposition testimony on this point, plaintiff proffers purported copies of letters from him to his supervisors complaining about Carlton's continuing education policies and written warnings from his supervisors regarding his refusal to attend the required classes. (See Appendix of Exhibits, Docket No. 71 (December 13, 2010) (including Exh. 1 (September 8, 2009 Notes by Meredith Trailor and Katherine Armstrong); Exh. 2 (Handwritten Letter from Jacobson to Trailor and Armstrong); Exh. 3 (Recommended Products); Exh. 4 (Written Warning dated July 1, 2009); Exh. 5 (Written Warning dated July 8, 2009); Exh. 6 (Handwritten Letter from Jacobson to Trailor and Armstrong); Exh. 7 (Typed Letter from Jacobson to Trailor and Armstrong); Exh. 8 (Written Warning dated July 1, 2009); Exh. 9 (Written Warning dated July 8, 2009); Exh. 10 (Jacobson's Certificates of Achievement in Various Required Classes)). Regis objects to the admission of these documents on authentication grounds. Under Rule 901 of the Federal Rules of Evidence, "the requirement of authentication or identification . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED.R.EVID. 901(a). Rule 901(b) provides a non-exhaustive list of "examples of authentication or identification conforming with the requirements of this rule," including the "[t]estimony of witness with knowledge."

"In a summary judgment motion, documents authenticated through personal knowledge must be 'attached to an affidavit that meets the requirements of [Rule] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.'" *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773-74 (9th Cir. 2002) (quoting *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987) (citation omitted)). Rule 56(e) requires that affidavits "be

voiced his objections regarding the mandatory class requirements to James O'Regan, the president

---

made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED.R.CIV.PROC. 56(e)(1). While Rule 56(e) does not require that documents be authenticated through the declaration of a witness with personal knowledge, see *Orr*, 285 F.3d at 774 ("a proper foundation need not be established through personal knowledge but can rest on any manner permitted by Federal Rule of Evidence 901(b) or 902"), when a party affirmatively elects to introduce documents in this manner, the declarant must have personal knowledge of the evidence attached to the declaration in order properly to authenticate and admit the exhibits. See *id.* at 777 ("Because Orr attempted to introduce Exhibit M by attaching it to Mirch's affidavit, Federal Rule of Civil Procedure 56(e) requires that Mirch have personal knowledge of the letter. Had Orr submitted the letter by attaching it to an exhibit list (rather than to Mirch's affidavit), the alternative means to authentication permitted by Federal Rule of Evidence 901(b) and 902 would have to be considered"); *Logan v. City of Pullman*, 392 F.Supp.2d 1246, 1253 (E.D. Wash. 2005) ("Exhibit C purports to be [pepper spray] instructor materials and was submitted by Plaintiffs to support their statements regarding the effects of [pepper spray]. Two of the pages found within Exhibit C are letters which have not been authenticated by the purported authors of the letters. Had Exhibit C been submitted in an exhibit list, rather than as an attachment to Mr. Cochran's declaration, the exhibit might have been self-authenticating under Federal Rule of Evidence 902(5) (official publications) or 902(6) (newspapers and periodicals). However, because Plaintiffs attempted to introduce Exhibit C by attaching it to Mr. Cochran's declaration, Rule 56(e) requires [that] Mr. Cochran have personal knowledge of the documents. Since Mr. Cochran does not have personal knowledge of the letters or the instructor materials, Mr. Cochran's declaration stating that Exhibit C is a 'true and correct copy' of documents received through public disclosure requests to the City of Pullman does not authenticate Exhibit C" (citations omitted)).

Plaintiff seeks to authenticate the exhibits in his Appendix through the declaration of his counsel, Carney Shegarian. As respects each exhibit, Shegarian states that it is a "true and correct copy" of the document. Shegarian does not state that he has personal knowledge of each document or provide facts supporting an inference that he does. The documents included in plaintiff's Appendix are thus inadmissible. See *Orr*, 285 F.3d at 777; *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990) (holding that the district court should not have considered a registration statement in deciding a motion for summary judgment because, although the corporation's attorney provided an affidavit explaining the firm's role in representing the corporation and summarizing the document's contents, he lacked the personal knowledge necessary to authenticate the registration statement). Shegarian was not a recipient or sender of the letters or written warnings; he asserts only that he is "familiar with the files, pleadings, and facts in this case." (Shegarian Decl., ¶ 1). This assertion does not suffice to authenticate the letters, warnings, recommended product list, or certificates of achievement, and the court sustains Regis' objection to all of the exhibits included in plaintiff's Appendix.

of Carlton Hair.[30]  Plaintiff contends that, in response, O'Regan yelled at him, saying: "You are an idiot. You are a loser. You disrespect this company. You are setting a terrible example for other stylists [by] not taking these classes.  How dare you question our classes?  How dare you question our policy?  I will have you fired in no time."[31]

Throughout 2007 and 2008, Trailor and Armstrong discussed plaintiff's continued refusal to take the required classes "[a]t least once a week."[32]  Plaintiff contends he "was told very specifically that [he would] get fired if [he] wouldn't take those classes."[33]  He "was told verbally by [Trailor] and by [Armstrong], and . . . there [was] one write-up that state[d] that, 'The deadline for taking a class has passed, and Sam hasn't taken that class yet. . . .  Continuing to [refuse to] do so will lead to being fired.'"[34]

## B.  Alleged Harassment Based on Plaintiff's Ethnicity/National Origin

Plaintiff is Kurdish and was born in Iraq; he lived there until he was fourteen years old, at which time his family moved to Sweden.[35]  Plaintiff came to the United States in 2001.[36]  When he arrived, his legal name was Sam Mahmoud.[37]  Plaintiff alleges that, shortly after he was hired, Trailor instructed Jacobson not to use his last name professionally nor to mention his Iraqi

---

[30]Jacobson Depo. at 125:21-122:24.  Plaintiff has acknowledged that  "[s]ometimes it's hard for [him] to remember exact months or dates of certain things."  (*Id*. at 7:17-18).  As a result, it is often unclear from his testimony when certain events occurred.  The court has attempted to reconstruct the timeline of events to the best of its ability, but it is unclear whether the alleged conversation with O'Regan occurred early or late in plaintiff's career with Carlton.

[31]*Id.* at 126:12-18.

[32]*Id.* at 140:17-142:19.

[33]*Id.*

[34]*Id.*

[35]*Id.* at 17:12-18:12.

[36]*Id.*

[37]*Id.* at 4:14-5:10; 232:6-9.

heritage, which she said would "offend" people.[38] She also directed him not to discuss the Middle East at work and suggested that he legally change his last name.[39] From 2006 until 2009, Jacobson used only the name "Sam"; his business cards did not have a last name on them.[40] Plaintiff asserts that Trailor repeatedly encouraged him to change his last name;[41] in 2009, he changed the name to Jacobson.[42]

Trailor allegedly discouraged plaintiff from revealing his Iraqi identity, even to his Middle Eastern clients.[43] She stated that she was trying to keep the salon "as white as possible" because "white people's hair takes shorter time to cut," and "they tip more because they are more educated."[44] Armstrong purportedly commented that "black people go to black salons. Why don't [ ] Arabs go to a salon [just for] Arabic people because their hair texture is different and it takes three times as long to cut an Arabic woman's hair."[45] Plaintiff asserts she also said: "[B]y the way, [an Arab woman] wears a [burqa] anyway. So who cares why is she cutting her hair?"[46] Although she and others in the store allegedly laughed, plaintiff did not find the remarks funny.[47] He asserts Armstrong also said that Arabs "smell."[48]

---

[38]*Id.* at 230:12-231:25.

[39]*Id.*

[40]*Id.* at 245:15-25.

[41]*Id.* at 231:19-25.

[42]*Id.* at 4:14-5:10; 232:6-9.

[43]*Id.* at 239:22-240:8.

[44]*Id.*

[45]*Id.* at 219:15-25.

[46]*Id.*

[47]*Id.*

[48]*Id.* at 219:25-220:4.

## C.    Plaintiff's Disability: Alleged Harassment and Requests for Accommodation

On October 9, 2007, plaintiff had an MRI and was diagnosed with a herniated disk in his back.[49]  Sometime in 2008, he disclosed this diagnosis to Trailor and Armstrong, and gave them a copy of his MRI.[50]  Plaintiff asserts that thereafter, "[t]hings got bad after that."[51]  Armstrong purportedly said: "'Why don't you quit[?]' . . . She said, 'We can't - - if we fire you, you can sue us.  Why don't you just quit.'"[52]  Plaintiff contends that "after [Trailor and Armstrong] [ ] realiz[ed] . . . he [had] back problems . . . they [ ] created an environment for [him] that was very, very hard to exist in."[53]

Plaintiff asserts that Trailor and Armstrong made sarcastic comments suggesting that they believed he was faking back pain and was just lazy.[54]  He testified that "[i]f [he was] cutting hair and [he] drop[ped] a comb, [Trailor] would say, 'Oh, don't bend over to pick up the comb.  We don't want your back to get herniated.'"[55]  He also maintained that "[the salon] would get shipments of color and stuff, and [ ] Meredith [Trailor] would say, '[Isn't Jacobson] ashamed of [himself]?  [He] let[s] the girls pick up those boxes, [he] [is] all built and muscled, and [he] [is] faking [his] back pain, and [he] do[es]n't want to pick up those boxes, help [them] arrange color, or take out the trash[.]'"[56]  The supervisors also purportedly made fun of his orthopedic shoes, saying: "'[Carlton] want[s] [Jacobson] to wear dress shoes.  It's unacceptable for [him] to wear

---

[49]*Id.* at 283:19-25.

[50]*Id.* at 181:6-10, 228:23-229:4.

[51]*Id.* at 229:3-4.

[52]*Id.* at 229:13-23.

[53]*Id.*

[54]*Id.* at 259:2-9; 276:1-8; 277:18-278:2.

[55]*Id.* at 277:14-25.

[56]*Id.*

those so-called MBT shoes. [He] look[s] like a clown.'"[57] He asserts that, additionally, they repeatedly noted his failure to participate in work-related social events, commenting: "'Of course, Sam is not participating because Sam has back problems,'" followed by "a sarcastic laugh or something."[58] Jacobson testified that Trailor and Armstrong made comments such as these daily from the time of his diagnosis until his termination.[59]

Commencing in July 2009, plaintiff made several requests for medical leave and workplace accommodations as a result of his herniated disk.[60] Plaintiff was "permitted to take a number of days off due to his reported back issues" during July 2009, and worked only four days per week.[61] On August 5, 2009, plaintiff had emergency back surgery.[62] As a result, he was allowed to take leave from August 5 to August 25, 2009.[63] When he returned to work on August 25, 2009, plaintiff alerted Trailor that the doctor had placed restrictions on his activity, including that he should not work more than six hours per day and should not twist or bend.[64] Regis allowed plaintiff to work a reduced schedule.[65] It contends that at first, plaintiff worked a reduced schedule of four days per week and six hours per day, and that, on September 9 and September 16, 2009, plaintiff requested further scheduling changes, which it also accommodated.[66]

---

[57]*Id.* at 278:11-25.

[58]*Id.* at 278:5-10.

[59]*Id.* at 278:11-25.

[60]Trailor Decl., ¶ 8.

[61]*Id.*, ¶ 9; Jacobson Depo. at 353:1-354:19.

[62]*Id.*; Jacobson Depo. at 276:18-23.

[63]Trailor Decl., ¶ 9; Jacobson Depo. at 352:1-4.

[64]Jacobson Decl., ¶ 13.

[65]Jacobson Depo. at 362:6-20.

[66]SUF, ¶¶ 31-34; Deposition of Katherine Armstrong ("Armstrong Depo."), Docket No. 71 (December 13, 2010) at 63:11-19; Jacobson Depo. 381:12-382:1.. Regis contends that on

Plaintiff also requested assistance shampooing his clients' hair because shampooing required that he twist and bend.[67]  There appears to be a dispute regarding the extent of plaintiff's request as well as what accommodations were actually provided.  Armstrong testified that plaintiff first asked other stylists for assistance with shampooing and later asked Carlton to hire an assistant for him.[68]  She asserts that Carlton was in the process of looking for an assistant for the salon as a whole at that time, and did not want to hire someone who was unqualified solely because of the urgency of plaintiff's situation.[69]  She also reports that plaintiff asked if he could personally hire an assistant, but that he was not allowed to do so because of Regis' corporate policy that "all employees must be employed by Regis."[70]  Trailor testified that until the salon was able to hire a qualified assistant, she "instructed the other stylists to help [plaintiff] shampoo his clients and believed there would normally be enough other stylists working at the same time as him who could help.  [She] [told plaintiff] . . . this[,] [directed] him to ask the other stylists for help shampooing when he needed it and [saw] other stylists assisting him with shampoos."[71]  She also testified that "[o]n one occasion, after [plaintiff] had asked for help shampooing, [she] observed him shampooing his own client instead of waiting for help.  [She] reminded him that he should abide

_____

September 16, 2009, plaintiff requested "still another new schedule [that] limited his weekly hours to 25 and workdays to four."  (SUF, ¶ 34).  Regis contends that as of August 25, 2009, it permitted plaintiff to work four days a week, six hours per day.  This would have resulted in a 24-hour work week.  (SUF, ¶¶ 31-32).  As a consequence, defendant's evidence suggests that the request plaintiff allegedly made on September 16, 2009 did not alter or reduce his schedule in any way.

[67]SUF, ¶ 29; SGI, ¶ 29.  Plaintiff contends that he made other requests for accommodations, including being able to wear orthopedic shoes to work and the use of a stool, but does not appear to contest the fact that asked for help shampooing.  (See SGI, ¶ 29).

[68]Armstrong Depo. at 63:20-64:15.

[69]*Id.* at 64:12:17.

[70]*Id.* at 64:18-25.

[71]Trailor Decl., ¶ 11.

by the work restrictions [about which] he [had] informed [Carlton]. . . ."[72]

Plaintiff testified that after he told Trailor of his need for shampooing assistance, she said: "Sam, we are not going to hire someone because you need someone to shampoo for you."[73] Plaintiff also stated that one other stylist helped him shampoo "a few times," but that Armstrong did not prepare the schedule so that there would always be someone present to assist him with shampoos.[74] He testified that Trailor told him that "[i]f [he was] going to work [at Carlton], [he] ha[d] to do everything like everybody else. [He had] to do [his] own shampoos like every other stylist [at Carlton]."[75]

### D. Plaintiff's Termination

The parties also dispute the circumstances surrounding plaintiff's termination. Regis contends that on October 8, 2009, it decided to place plaintiff on FMLA leave after he submitted medical documentation stating that he was required to refrain from all twisting and bending.[76] Plaintiff had not requested FMLA leave.[77] Plaintiff describes the events somewhat differently. He asserts that in the "hair business, [] if you are gone twelve weeks without doing clients, your clients' hair grows. . . . [I]f you are not around, they will go somewhere else."[78] He contends that he was placed on twelve weeks of FMLA leave "so [that], when [he came] back, [he] would have no clients. [He] would not have a job." He asserts that the decision to place him on leave

---

[72]*Id.*, ¶ 12.

[73]Jacobson Depo. at 274:2-7.

[74]*Id.* at 345:7-347:9.

[75]*Id.* at 348:25-349:3.

[76]Deposition of Michelle O'Donnell ("O'Donnell Depo."), Docket No. 71 (December 13, 2010) at 21:5-22.

[77]*Id.*

[78]Jacobson Depo. at 392:20-393:11.

was tantamount to "career suicide."[79]  He believes that, although "[he] wasn't fired [on October 8, 2009]," the FMLA leave "was Carlton's way [of] indirectly ask[ing] [him] to quit because, . . . you can't ask any hairstylist . . . not [to] work for twelve weeks and expect [him] to have clients."[80]

Although he understood that being placed on FMLA leave did not constitute formal termination, plaintiff asserts that his supervisors orally told him that he had been terminated. After he received a letter advising that he had been placed on FMLA leave, he contacted Trailor, who told him that she would "send [him his] last check" and "send [him] back [his] license."[81] When he asked Trailor why she was sending him back his license, since he was coming back in twelve weeks, she told him that they "both kn[e]w that [he] [was] not coming back in twelve weeks."[82]  He took this to mean that "that this was basically [him] getting fired."[83]

On October 14, 2009, Jacobson commenced work as an independent contractor at the Yuki Sharoni Salon ("Yuki Sharoni").[84]  At approximately this same time, a salon employee reported to Trailor that one of Carlton's clients said that he had received an email from plaintiff stating that he was working at another salon.[85]  Trailor began to investigate the report.[86]  On October 15,

---

[79]*Id.*

[80]*Id.*

[81]*Id.* at 394:2-5.

[82]*Id.* at 394:6-10.

[83]*Id.* at 394:15-16.

[84]*Id.* at 394:13-395:11.

[85]Trailor Decl., ¶ 14.  Plaintiff objects to this statement on the ground that Trailor lacks personal knowledge, that the statement contradicts sworn testimony, and that it is hearsay.  Under Rule 602 of the Federal Rule of Evidence, a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Here, Trailor is testifying to a conversation she had personally with a Carlton employee; while Trailor did not participate in or observe the employee's conversation with the client, and thus is not competent to testify to that conversation, she is competent to testify to the report which she personally received.  Plaintiff's lack of personal knowledge objection is therefore overruled.

14

2009, she accessed the webpage www.hairbysam.com,[87] and saw a photograph she recognized as plaintiff.[88]   The website stated that plaintiff was working for a hair stylist in Beverly Hills, California, known as Yuki Sharoni.[89]   On October 21, 2009, Trailor telephoned plaintiff to discuss whether he was working at another hair salon.[90]   She telephoned him at least two additional times that same week, but never received a return call from him.[91]   On or about October 23, 2009, Trailor telephoned the Yuki Sharoni Salon and asked to speak with "Sam."[92]   She was told that

---

Rule 801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The portion of Trailor's declaration at issue contains multiple out-of-court statements, each of which must fall within an exception to the hearsay rule to be admissible.   See FED.R.EVID. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules"). Plaintiff's purported statement in an email that he was working at the Yuki Sharoni Salon is admissible non-hearsay under Rule 801 as an admission by a party-opponent.   See FED.R.EVID. 801 ("A statement is not hearsay if . . . [t]he statement is offered against a party and is (A) the party's own statement. . ."). The remaining two levels of statements (the statement of the client to the Carlton employee and the statement of the employee to Trailor) are likewise admissible non-hearsay as they are not offered for the truth of the matter asserted.   Specifically, the statements are admissible for their effect on the hearers.   As Regis' intent or reasons for terminating Jacobson are at issue in the case, evidence that its employees believed that plaintiff was working for Yuki Sharoni is relevant, whether or not he was in fact so employed at that time.   As a result, plaintiff's hearsay objection is overruled.

Finally, as plaintiff has provided the court with no evidence of "sworn testimony" that Trailor's declaration contradicts and the court can find none, this objection is overruled as well.

[86]Trailor Decl., ¶ 14.

[87]Id., ¶ 15.

[88]Id.

[89]Id.

[90]Id., ¶ 16.

[91]Id.

[92]Id., ¶ 17.

15

1  he was with a client and she should call back later.[93]

2  On November 10, 2009, Regis terminated plaintiff, citing his employment at Yuki Sharoni,

3  which violated its conflict of interest policy, as the reason for the termination.[94]  Between 2006

4  and tha2010, Regis terminated more than fifty of its California employees for violating the conflict

5  of interest policy.[95]

6

7  ## II.  DISCUSSION

8  ### A.  Legal Standard Governing Motions for Summary Judgment

9  A motion for summary judgment must be granted when "the pleadings, the discovery and

10  disclosure materials on file, and any affidavits show that there is no genuine issue as to any

11  material fact and that the movant is entitled to judgment as a matter of law."

12  FED.R.CIV.PROC. 56(c).  A party seeking summary judgment bears the initial burden of informing

13  the court of the basis for its motion and of identifying those portions of the pleadings and

14  discovery responses that demonstrate the absence of a genuine issue of material fact.  See *Celotex*

15  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

16  242, 248 (1986) ("[T]he substantive law will identify which facts are material.  Only disputes over

17  facts that might affect the outcome of the suit under the governing law will properly preclude the

18  entry of summary judgment. . . .  [S]ummary judgment will not lie if the dispute about a material

19  fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for

20  the nonmoving party").

21

22

23  [93]*Id.*  Plaintiff does not object to this evidence.  The court, however, notes that the statements made by the person who answered the phone at Yuki Sharoni are not admissible for

24  the truth of the matter asserted – that Jacobson was indeed with a client and that Trailor should call back later – but for their effect on Trailor, who believed the statement meant that plaintiff was

25  working at Yuki Sharoni.

26  [94]O'Donnell Depo. at 24:22-25:17.

27  [95]Muellerleile Decl., ¶¶ 3-4; Deposition of James O'Regan ("O'Regan Depo."), Docket

28  No. 71 (December 13, 2010) at 75:8-22.

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *Celotex Corp.*, 477 U.S. at 323. If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250; FED.R.CIV.PROC. 56(e)(2).

Evidence presented by the parties at the summary judgment stage must be admissible. FED.R.CIV.PROC. 56(e)(1). In reviewing the record, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**B.      Whether Regis is Entitled to Summary Judgment on Plaintiff's Claim for Breach of Employment Contract**

Regis seeks summary judgment on plaintiff's first claim for breach of employment contract, asserting that his employment was expressly "at will" or, alternatively, that he was discharged for good cause.[96]    To prevail on this claim, plaintiff must prove the existence of a valid

---

[96]Plaintiff's complaint pleads two separate breach of contract theories: that there was an express oral agreement that he would be terminated only for good cause; and that there was an implied contract to terminate him only for good cause. In his opposition, plaintiff addresses only whether there was an implied in fact contract. By failing to include any argument on the express oral contract theory, plaintiff has abandoned it. See, e.g., *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (holding that a plaintiff 'abandoned . . . claims by not raising them in opposition to [defendant's] motion for summary judgment,'" quoting *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n. 4 (9th Cir. 2005) (alteration original)); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n. 2 (7th Cir. 1996) ("Bombard's complaint also alleged that FWN

employment contract, his performance of the contract or excuse for nonperformance, Regis'
breach, and resulting damage. See *Coprich v. Superior Court*, 80 Cal.App.4th 1081, 1092
(2000); *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 307 (1999); *Walsh v. West
Valley Mission Community College District*, 66 Cal.App.4th 1532, 1545 (1998). See also *Kremen
v. Cohen*, 99 F.Supp.2d 1168, 1171 (N.D. Cal. 2000).

---

violated the Family and Medical Leave Act. . . . Bombard abandoned his FMLA claim after
failing to respond to the FMLA arguments in FWN's motion for summary judgment"); *Resolution
Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the
district court to distill every potential argument that could be made based upon the materials before
it on summary judgment. Rather, the onus is upon the Parties to formulate arguments; grounds
alleged in the complaint but not relied upon in summary judgment are deemed abandoned").

Even were he continuing to assert an express oral contract theory, plaintiff has failed to
raise triable issues regarding the existence of such a contract. Trailor's and Sanchez's assurances
of continued employment if Jacobson did a good job and their statements that Carlton "never fired
anyone for no reason" do not create an express contract or constitute a published employment
policy that overcomes the at-will presumption. See *Foley v. Interactive Data Corp.*, 47 Cal.3d
654, 675 (1988) ("Although plaintiff describes his cause of action as one for breach of an oral
contract, he does not allege explicit words by which the parties agreed that he would not be
terminated without good cause. Instead he alleges that a course of conduct, including various oral
representations, created a reasonable expectation to that effect. Thus, his cause of action is more
properly described as one for breach of an implied-in-fact contract"); *id.* at 675 n. 20 ("Plaintiff
alleges defendant maintained written 'Guidelines for Termination' that required good cause for
discharge of an employee, and that plaintiff understood these guidelines applied to him. If he had
further alleged that the parties expressly agreed that these guidelines governed his employment,
he could state a cause of action for breach of an express oral contract. He has made no such
allegation"); *Zilmer v. Carnation Co.*, 215 Cal.App.3d 29, 34-36 (1989) (citing *Foley* and
concluding that there was no viable claim for breach of express oral contract alleged where
plaintiff pleaded that the terms and conditions of his employment included oral and written
representations that the employer "would not act arbitrarily in dealing with him, and would not
terminate his employment except for good cause," but "he [did] not allege explicit words by which
the parties agreed that he would not be terminated without good cause"), overruled on other
grounds by *Turner v. Anheuser-Busch, Inc.*, 7 Cal.4th 1238 (1994); *Wilkerson v. Wells Fargo
Bank*, 212 Cal.App.3d 1217, 1225 n. 2 (1989) ("Although Wilkerson describes his cause of action
as one for breach of an oral contract, where a plaintiff 'does not allege explicit words by which
the parties agreed that he would not be terminated without good cause [but] [i]nstead . . . alleges
that a course of conduct, including various oral representations, created a reasonable expectation
to that effect . . . [the] cause of action is more properly described as one for breach of an
implied-in-fact contract"), abrogated on other grounds by *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317
(2000) and *Cotran v. Rollins Hudig Hall Intern., Inc.*, 17 Cal.4th 93 (1998) .

### 1. Breach of Implied Contract to Terminate Only for Cause

California Labor Code § 2922 provides that "[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other." CAL. LABOR CODE § 2922. At-will employment "is terminable at any time without cause," *Foley*, 47 Cal.3d at 680, and is not subject to any procedural requirements except statutory notice, see, e.g., *Guz*, 24 Cal.4th at 335.

While the statutory presumption of at-will employment is strong, it may be rebutted by evidence of the parties' contrary intent. This includes evidence of an express contract "limiting the employer's right to discharge the employee." *Foley*, 47 Cal.3d at 665 (internal citations omitted). It also includes evidence of an implied-in-fact contract arising from conduct that shows a mutual intent to limit the at-will doctrine. *Guz*, 24 Cal.4th at 336 (citing *Foley*, 47 Cal.3d at 680). See also *Foley*, 47 Cal.3d at 677 ("The absence of an express written or oral contract term concerning termination of employment does not necessarily indicate that the employment is actually intended by the parties to be at-will, because the presumption of at-will employment may be overcome by evidence of contrary intent").

In *Foley*, the California Supreme Court identified several factors that are relevant in determining whether an implied agreement limiting the employer's right to terminate an employee exists. These include "'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.'" *Foley*, 47 Cal.3d at 680 (quoting *Pugh v. See's Candies, Inc.*, 116 Cal.App.3d 311, 327 (1981)). "[T]he totality of the circumstances determines the nature of the contract," the *Foley* Court stated, and "'the acts and conduct of the parties [should be] interpreted in the light of the subject matter and of the surrounding circumstances.'" *Id.* at 681 (quoting *Pugh*, 116 Cal.App.3d at 329); *Estes v. AlliedSignal, Inc.*, C 97-1810 MHP, C 97-3102 MHP, 1998 WL 814638, *12 (N.D. Cal. Nov. 12, 1998) ("The existence of an implied contract of employment turns on the intent of the parties. Courts look to the totality of the circumstances surrounding a plaintiff's employment to determine the intent of the parties and the existence of an implied contract. Factors to be considered are: (1)

the employer's personnel policies and procedures; (2) the employee's longevity of service; (3) the employer's communications or actions 'reflecting assurances of continued employment'; (4) apparent lack of criticism; and (5) practices of the industry in which the employee is engaged" (citations omitted)).

Plaintiff bears the burden of proving that the parties entered into an implied contract that he would only be terminated for good cause. *Foley*, 47 Cal.3d at 682 (stating that the party relying on an implied contract not to terminate absent good cause carries the burden of proving its existence at trial). To survive defendant's motion for summary judgment, therefore, plaintiff must adduce evidence showing that there are triable issues of fact regarding the existence of such a contract. See *Anderson*, 477 U.S. at 250.

Plaintiff contends he has raised triable issues of fact regarding the existence of an implied contract to terminate only for good cause, citing the length of his employment with Carlton (more than three years), the promotions he received, defendant's general practice of terminating only for good cause, and defendant's oral assurances regarding its general practice during his interview and after he was hired.

The length of plaintiff's employment, standing alone, is insufficient to show the existence of an implied-in-fact agreement. "The Ninth Circuit has expressly held that employment longevity, raises, and promotions without specific words or conduct by the employer negating at-will employment, will not suffice to raise triable issue of fact." *Meraz v. Jo-Ann Stores, Inc.*, CV 03-2914 GAF, 2004 WL 882458, *9 (C.D. Cal. Apr. 2, 2004) (citing *Moreau v. Air France*, 343 F.3d 1179, 1191 (9th Cir. 2003)).

Additionally, although he asserts that defendant's general practice was to terminate only for cause, plaintiff has adduced no evidence of such a practice or policy. Nor does it appear that he could, since all of Regis' policy manuals contain language advising employees of their at-will status. Rather, plaintiff relies on the statements purportedly made by Trailor and Sanchez that if he did a good job, he would always have a position with Carlton. Plaintiff contends that during his initial interview with Sanchez and Trailor, he was told that "one of the reasons they [were glad he had] appl[ied] for the company [was because he] was older, and . . . because [they] like people

20

to stay with the company for a very, very long time.'"[97]   Trailor and Sanchez purportedly also said that they were "not interested in people that [were only] going to work for the company [for] a year or two and leave."[98]   The women allegedly told plaintiff that, "[a]s long as [he] d[id] a good job, [he would] always, always have a job with [Carlton],"[99] and assured him that "Carlton, in general, never fires people for no reason, and you will not get fired for no reason.   As long as you do a good job, you will always, always have a job with [Carlton]."[100]   These statements, in combination with Jacobson's positive work history, early promotions, and the length of time he was employed by the company, are sufficient to raise triable issues of fact as to whether he can rebut the presumption of at-will employment.   Compare *White v. Hansen*, C 05-784 SBA, 2005 WL 1806367, *11 (N.D. Cal. July 28, 2005) (dismissing plaintiff's implied-in-fact contract claim in part because "[p]laintiff suggests that he received oral assurances of continued employment, but does not indicate when he received them or from whom").

Regis asserts there can be no finding of an implied-in-fact contract as a matter of law because plaintiff's at-will employment status was memorialized in his signed employment application, his signed personnel data sheet, and his orientation packet.   While there is a dispute as to whether plaintiff received all the documents that are generally contained in the orientation packet, it is undisputed that plaintiff twice signed documents recognizing his at-will employment status.   It is also undisputed that Regis' personnel handbook contained a provision stating that all employees were at-will.[101]

Cases in California and elsewhere have held that at-will provisions contained in personnel handbooks, manuals, or memoranda do not bar the introduction of, or necessarily overcome, other

---

[97]Jacobson Depo at 30:16-31:14.

[98]*Id.*

[99]*Id.*

[100]*Id.* at 31:21-25.

[101]Application for Employment at 71; Personnel Data Sheet at 73.

21

evidence that an employer intended to terminate only for cause. See, e.g., *Guz*, 24 Cal.4th at 340 ("[D]isclaimer language in an employee handbook or policy manual does not necessarily mean an employee is employed at will"); *Walker v. Blue Cross of Cal.*, 4 Cal.App.4th 985, 993 (1992) ("In contending that appellant is an 'at-will' employee, Blue Cross points to language in the employee handbook which states that its relationship with its employees is 'voluntary employment "at will."'" However, where the employment relationship has not been reduced to an integrated written agreement, signed by the employee, language in the handbook that there is an at-will employment relationship does not establish the nature of the relationship as a matter of law"), abrogated on other grounds in *Guz*; *Wilkerson*, 212 Cal.App.3d at 1227-28 ("Here, the Bank and Wilkerson did not reduce their employment relationship to an integrated writing. Thus, rather than being controlling, the employee handbook and [Service and Operations Manual] are factors to be considered by the jury in determining the existence and content of the employment agreement"), abrogated on other grounds in *Guz*. Even where an employee handbook contains at-will language, therefore, a court may find an implied-in-fact contract, assuming evidence of a contrary intent is presented.

The justification for allowing a court to find an implied-in-fact contract under such circumstances "is that parol evidence is admissible to explain, supplement, or even contradict the terms of an unintegrated agreement, and that handbook disclaimers should not permit an employer, at its whim, to repudiate promises it has otherwise made in its own self-interest, and on which it intended an employee to rely." *Guz,* 24 Cal.4th at 340. It is clear, however, that handbook disclaimers are relevant evidence in assessing the "totality of the circumstances" surrounding the plaintiff's employment. As the *Guz* Court noted:

"[E]ven if a handbook disclaimer is not controlling in every case, neither can such a provision be ignored in determining whether the parties' conduct was intended, and reasonably understood, to create binding limits on an employer's statutory right to terminate the relationship at will. Like any direct expression of employer intent, communicated to employees and intended to apply to them, such language must be taken into account, along with all other pertinent evidence, in ascertaining the terms

on which a worker was employed." *Id.* (citing *Wilkerson*, 212 Cal.App.3d at 1227).

Here, it is uncontested that plaintiff filled out and signed a Personnel Data Sheet "acknowledg[ing] that [he] ha[d] received, read, and underst[oo]d the materials titled 'Important Information for the New Employee.'"[102] It is also undisputed that the first page of the document titled "Important Information for the New Employee" stated, in capital letters, "NOTHING IN THE INFORMATION PROVIDED HEREIN, NOR IN ANY OTHER WRITTEN OR UNWRITTEN POLICIES AND PROCEDURES OF THE COMPANY; CREATES OR IS INTENDED TO CREATE, AN EXPRESS OR IMPLIED CONTRACT, COVENANT, PROMISE, OR REPRESENTATION BETWEEN THE COMPANY AND ANY EMPLOYEE. ALL EMPLOYEES ARE AT-WILL AND THE COMPANY HAS THE RIGHT TO TERMINATE ANY EMPLOYEE AT ANY TIME, WITH OR WITHOUT NOTICE. ANY EXCEPTION TO THE AT-WILL RELATIONSHIP MUST BE EVIDENCED BY A WRITTEN AGREEMENT SIGNED BY THE EMPLOYEE AND THE COMPANY PRESIDENT."[103]

Plaintiff, however, has testified that he did not receive all orientation documents, possibly including 'Important Information for the New Employee"; he contends that although he was missing some documents, he was required to sign the acknowledgment on the Personnel Data Sheet.[104]

Plaintiff's execution of the acknowledgment does not bar a finding that an implied-in-fact contract to terminate only for cause was created by his supervisors' oral representations. The acknowledgment is not an integrated agreement, and the disclaimer itself is boilerplate language. A jury might reasonably conclude that this provision did not negate the impression that Regis

---

[102]Personnel Data Sheet at 73.

[103]Trailor Decl., Exh. B (New Employee Orientation Packet) at 5.

[104]Jacobson Depo at 33:3-7 ("You just have to sign it because everybody has to sign it. That's just the way it works, but we promise you, you have our word, as long as you do a good job, you will always have a job with Carlton").

23

employees had certain job protections created by Sanchez's and Trailor's purported representations that "[they] promise[d] [him], [he] ha[d] [their] word, as long as [he] [did] a good job, [he would] always have a job with Carlton[.]" [105]

"In contract law, 'integration' means the extent to which a writing constitutes the parties' final expression of their agreement." *Esbensen v. Userware Int'l, Inc.*, 11 Cal.App.4th 631, 636 (1992). The acknowledgment contains no integrating language. Moreover, if a jury were to credit plaintiff's testimony, it could find that he was induced to sign the acknowledgment without seeing the capitalized warning regarding at-will employment and relied on promises of secure employment. The fact that plaintiff signed the acknowledgment, therefore, does not, as a matter of law, bar a finding that there was an implied contract to terminate only for cause.

Regis next contends that the employment application plaintiff completed constitutes an express written agreement for at-will employment. The concluding paragraphs of the employment application states, in relevant part:

> "I understand that this application is not a contract, offer or promise of employment and that if hired, I will be able to resign at any time for any reason. Likewise, Regis Corporation can terminate my employment at any time with or without cause. Furthermore, I understand that no person other than the President of Regis Corporation has the authority to enter into an employment contract with me and that any exception to my at-will relationship must be evidenced by a written agreement signed by me and the President of Regis Corporation." [106]

"[M]ost cases applying California law, both pre- and post-*Foley*, have held that an at-will provision in an express written agreement, signed by the employee, cannot be overcome by proof of an implied contrary understanding." *Guz*, 24 Cal.4th at 339 n. 10. [107] At-will provisions in

---

[105]*Id.*

[106]Application for Employment at 71.

[107]See, e.g., *Halvorsen v. Aramark Unif. Servs., Inc.*, 65 Cal.App.4th 1383, 1387-89 (1998); *Cruey v. Gannett Co.*, 64 Cal.App.4th 356, 362-63 (1998); *Haggard v. Kimberly Quality*

employment applications, as opposed to employment agreements, however, do not automatically bar a finding that an implied-in-fact contract to terminate only for cause has been created. In *Seubert v. McKesson Corp.*, 223 Cal.App.3d 1514 (1990), prior to being offered employment, plaintiff signed an employment application stating: "I understand and agree, if hired, my employment is for no definite period and may, regardless of the date of payment of my wages and salary, be terminated at any time without any prior notice." *Id.* at 1517. The California Court of Appeal noted that

> "the application form did not state Seubert's salary or position and was a standardized two page form. While it stated that employment was for no definite period and could be terminated at any time, it did not contain an integration clause and it did not state that employment could be terminated for any reason." *Id.* at 1520 (footnote omitted).

"[D]espite the termination at-will language in the employment application," therefore, the court proceeded to analyze "other factors [that] indicate[d] . . . the application was not intended to be the entire employment agreement between the parties." *Id.* Having done so, it concluded that an implied contract requiring cause for termination existed.

Likewise, in *McLain v. Great Am. Ins. Cos.*, 208 Cal.App.3d 1476, 1484-85 (1989), plaintiff completed an employment application requesting information regarding his employment and educational background. The form did not specify McLain's position or salary. The back page of the form contained the following provision:

> "In consideration of my employment, I agree to conform to the rules and

---

*Care, Inc.*, 39 Cal.App.4th 508, 516-22 (1995); *Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal.App.4th 620, 629-30 (1995); *Tollefson v. Roman Catholic Bishop*, 219 Cal.App.3d 843, 849-52, 855-57 (1990); *Anderson v. Savin Corp.*, 206 Cal.App.3d 356, 360, 363-64 (1988); *Gerdlund v. Electronic Dispensers Int'l*, 190 Cal.App.3d 263, 267-68, 270-76 (1987); *Malmstrom v. Kaiser Aluminum & Chem. Corp.*, 187 Cal.App.3d 299, 309, 313-18 (1986). See also *Gianaculas v. Trans World Airlines, Inc.*, 761 F.2d 1391, 1394 (9th Cir. 1985); *Baker v. Kaiser Aluminum & Chem. Corp.*, 608 F.Supp. 1315, 1320-21 (N.D. Cal. 1984); *Crain v. Burroughs Corp.*, 560 F.Supp. 849, 851-52 (C.D. Cal. 1983); *Crossen v. Foremost-McKesson, Inc.*, 537 F.Supp. 1076, 1077 (N.D. Cal. 1982).

regulations of the GREAT AMERICAN INSURANCE COMPANY, and I agree that my employment and compensation can be terminated with or without cause, and with or without notice, at any time, at the option of either the GREAT AMERICAN INSURANCE COMPANY or myself. I also understand and agree that the terms and conditions of my employment may be changed, with or without cause, and with or without notice, at any time by the GREAT AMERICAN INSURANCE COMPANY. I understand that no representative of the GREAT AMERICAN INSURANCE COMPANY has any authority to enter into an agreement for any specified period of time, or to make any agreement contrary to the foregoing." *Id.* at 1480.

McLain signed the form a few lines below this clause. He later testified that he never read the language and that no one from Great American pointed it out or discussed it with him. *Id.*

Like the court in *Seubert*, the *McLain* court focused on "whether the application form was an integrated contract." *Id.* at 1484. It summarized two earlier cases, *Gerdlund*, 190 Cal.App.3d 263, and *Anderson*, 206 Cal.App.3d 356, both of which analyzed written employment contracts to determine whether they were fully integrated documents. Based on this review, the *McLain* court identified several factors relevant to the integration determination. In *Gerdlund*, it stated, four factors led to a finding that there was an integrated contract: (1) the agreement itself contained an integration clause; (2) the employee had participating in drafting the agreement, including its termination provision; (3) the agreement was six pages long and seemingly covered all aspects of the employment relationship; and (4) the provision stating that "[n]otice of termination may be given by either party at any time and for any reason" precluded a separate collateral agreement regarding reasons for termination. *McLain*, 208 Cal.App.3d at 1484 (citing *Gerdlund*, 190 Cal.App.3d at 271-72). In *Anderson*, the contract expressly stated that it was the "entire arrangement between the parties" and could "not be modified except by written approval." It incorporated a covenant stating that nothing could "interfere in any way with the right of Savin to terminate the undersigned's employment at any time, with or without cause, without liability." *McLain*, 208 Cal.App.3d at 1484 (citing *Anderson*, 208 Cal.App.3d at 360).

The *McLain* court held that the factors emphasized in *Gerdlund* and *Anderson* were

26

"conspicuously absent" in McLain's employment application:

> "For example, the application signed by McLain does not contain an integration clause but in fact provides that the terms and conditions of employment 'may be changed, with or without cause, and with or without notice, at any time by the Great American Insurance Company.' This language not only suggests that the application was not integrated, but also indicates that the parties specifically intended their relationship to remain subject to change in terms and conditions. In addition, the application was a standardized two-page form. . . . Unlike the contract in *Gerdlund*, the Great American application was brief, did not cover either McLain's salary or position and consisted of a preprinted form drafted solely by Great American. In fact, McLain did not receive written verification of his salary or position until after he started working for Great American." *Id.* at 1485.

See also *Brawthen v. H & R Block, Inc.*, 28 Cal.App.3d 131, 138-39 (1972) (concluding that a written employment agreement was not integrated and emphasizing that the contract "consisted of a fully utilized two-page single[-]spaced mimeographed form with blank spaces provided for the date, the 'managers' name, and the subject 'city.' It was not readily adaptable to erasure, or new matter, or changes in its text").

Like those signed by Seubert and Anderson, the employment application plaintiff completed was a standardized two-page form that did not state his salary or position. Unlike Gerdlund, Jacobson did not help draft the application, and the form did not address all aspects of his employment relationship. Additionally, the application contained nothing akin to the provision found in Anderson's contract that the document constituted the "entire arrangement between the parties." See *Anderson*, 208 Cal.App.3d at 360.

Nonetheless, plaintiff's employment application stated that "Regis Corporation can terminate my employment at any time with or without cause." Compare *Seubert,* 223 Cal.App.3d at 1520 (the application "did not state that employment could be terminated for any reason"). More significantly, it advised that "no person other than the President of Regis Corporation has the authority to enter into an employment contract with me and that any exception to my at-will

relationship must be evidenced by a written agreement signed by me and the President of Regis Corporation." While this provision differs from the archetypal integration clause, which states that the writing is "a complete and final embodiment of the terms of an agreement" (see *Masterson v. Sine*, 68 Cal.2d 222, 225 (1968)), at least one court has characterized a similar statement as an integration clause. See *Haggard*, 39 Cal.App.4th at 518 (holding that a statement "that there are 'no express or implied agreements contrary' to the at-will provision, that no employee or representative of the Company other than the president of the Company may make any contrary agreement, and that the president 'can only enter into an agreement contrary to the foregoing if the president does so in a formal written agreement that is fully executed by the president and Employee'" was an integration clause).

Unlike the statement contained in plaintiff's application, however, the *Haggard* integration clause explicitly stated that there were "no express or implied agreements contrary" to the at-will provision. Furthermore, plaintiff's application does not appear to have been intended as the final expression of the parties' agreement. It does not state plaintiff's salary or position. It does not identify his job responsibilities, and does not address whether he was to receive benefits beyond his salary. These are crucial terms of any employment relationship. The application, moreover, expressly states that it "is not a contract, offer, or promise of employment," and that "no person other than the President of Regis Corporation has the authority to enter into an employment contract with" Jacobson. See *Wagner v. Glendale Adventist Medical Center*, 216 Cal.App.3d 1379, 1386-87 (1989) ("Given the contingent language used, as well as the lack of such essential terms as position and salary, it is clear the employment application is not intended as a full and complete employment contract. In actuality, it is a noncontractual document – a mere solicitation of an offer of employment. As such, it cannot, in and of itself, be an integration"); see also *Harden v. Maybelline Sales Corp.*, 230 Cal.App.3d 1550, 1555-56 (1991) ("However, an application for employment is not a contract; it is a mere solicitation of an offer of employment. As such the application cannot constitute an agreement, let alone a partially integrated agreement. We are of the view that the at-will clause contained in defendants' standardized, preprinted employment application is merely evidence concerning the ultimate agreement entered into

between the parties. Not being an integrated agreement, the parol evidence doctrine does not preclude consideration of contemporaneous oral agreements. Since plaintiff has produced conflicting evidence that there was an implied contract not to terminate except for good cause, there is a triable issue of fact concerning the terms of plaintiff's employment" (citations omitted) Considering the employment application as a whole in light of the evidence presently in the record, therefore, the court concludes that it is not an integrated contract and does not bar a finding that there was an implied-in-fact contract to terminate only for cause.[108]

The parties address only fleetingly the Personnel Data Sheet plaintiff signed. This document contained the following language: "I further understand that no provision contained in 'Important Information for the New Employee' is intended to create a contract or guarantee of employment between Regis Corporation and any employee, or to limit the rights of the company and its employees to terminate the employment relationship at any time, for any reason in the company's sole discretion."[109] While the Personnel Data Sheet contains many of the features of an integrated contract that the application is lacking – e.g., plaintiff's job title and hourly wage – there is no evidence that the document was intended to be the final expression of the parties' agreement. The acknowledgment contains no integrating language, and neither party has adduced

---

[108]At the January 24, 2011 hearing, defense counsel cited the Ninth Circuit's 1985 decision in *Gianaculas*. The *Gianaculas* court appeared to hold that an employment application constituted an express agreement for at-will employment that precluded consideration of parol evidence regarding the parties' contrary intent. *Gianaculas*, 761 F.2d at 1394 (citing *Shapiro v. Wells Fargo Realty Advisors*, 152 Cal.App.3d 467, 482 (1984), a case in which an employee signed a stock option agreement stating that employment was at will, and the court held that "[t]here cannot be a valid express contract and an implied contract each embracing the same subject, but requiring different results"). Subsequent California decisions demonstrate, however, that *Gianaculas* is factually distinguishable. In *Gianaculas*, the at-will provision was one of "several conditions" set forth in the employment application; the terms were sufficiently detailed that there was no other written employment contract. *Id.* at 1393. In this case, as in *Seubert*, *McLain*, and *Harden*, plaintiff's employment application did not contain essential information regarding the conditions of his employment, such as his job title or wage. Many of the terms of Jacobson's employment remained to be decided at the time he completed the application. Consequently, the California authority cited above governs the factual situation in this case rather than *Gianaculas*.

[109]Personnel Data Sheet at 73.

29

evidence that Regis and Jacobson treated the Personnel Data Sheet as an express employment contract. Indeed, the title of the document suggests it is merely a form collecting data on a new employee, such as social security number, address, and cosmetology licensing information. Given this, and plaintiff's testimony that at the very moment he signed the Personnel Data Sheet, Sanchez and Trailor discounted its importance, calling it mere "legal stuff," and made promises of secure employment, the court concludes there is sufficient evidence from which a jury could find that plaintiff had an implied-in-fact contract requiring termination only for cause.

### 2. Good Cause

Although disputing that an implied agreement existed, defendant argues that even if it was contractually bound to terminate plaintiff only for good cause, it had cause given plaintiff's breach of the non-competition contract. As stated by the California Supreme Court in *Cotran v. Rollins Hudig Hall Int'l*, 17 Cal.4th 93, 107-08 (1998), ". . . the term 'good cause' in the context of implied employment contracts [is] defin[ed] . . . as fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual. A reasoned conclusion, in short, supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond."

Because, as discussed *infra*, plaintiff has adduced evidence raising triable issues of fact as to whether his termination was motivated by improper discrimination, he has also raised triable issues as to whether defendant had good cause – i.e., a fair and honest reason – for terminating his employment. Accordingly, the court denies defendant's motion for summary judgment on the first cause of action.

### C. Whether Regis is Entitled to Summary Judgment on Plaintiff's Fourth Claim for Discrimination Due to Physical Disability Under FEHA

Regis has moved for summary judgment on plaintiff's fourth claim to the extent it alleges discrimination due to physical disability. It does not seek summary judgment on plaintiff's claim of harassment based on physical disability.

### 1. Legal Standard Governing FEHA Actions

FEHA prohibits employers from discriminating against employees on certain enumerated grounds, including race and physical disability. CAL. GOV'T CODE § 12940(a). In relevant part, the statute defines "physical disability" as "any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that . . . affects one or more of the following body systems: neurological, immunological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine [and] . . . limits a major life activity. . . ."[110] CAL. GOV'T CODE § 12926(k)(1); see generally *Cassista v. Community Foods, Inc.*, 5 Cal.4th 1050, 1143-61 (1993) (providing a detailed overview of the law of "physical handicap"/"physical disability" discrimination in California), superseded by statute as recognized in *Bagatti v. Department of Rehabilitation*, 97 Cal.App.4th 344 (2002).

In evaluating discrimination claims under FEHA, California looks to federal precedent governing analogous federal discrimination laws. See *Guz*, 24 Cal.4th at 354 ("Because of the similarity between state and federal employment discrimination laws, California courts look to

---

[110]Sections 12926(k)(1) and (2) state that the term "physical disability" includes:

"(1)  Having any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does both of the following:

    (A)  Affects one or more of the following body systems: neurological, immunological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine.

    (B)  Limits a major life activity. For purposes of this section:

        (i)  'Limits' shall be determined without regard to mitigating measures such as medications, assistive devices, prosthetics, or reasonable accommodations, unless the mitigating measure itself limits a major life activity.

        (ii)  A physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss limits a major life activity if it makes the achievement of the major life activity difficult.

        (iii)  'Major life activities' shall be broadly construed and includes physical, mental, and social activities and working.

(2)  Any other health impairment not described in paragraph (1) that requires special education or related services." CAL. GOV'T CODE § 12926(k).

pertinent federal precedent when applying our own statutes. . . .  In particular, California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination . . . based on a theory of disparate treatment" (citations omitted)); *Caldwell v. Paramount Unified School District*, 41 Cal.App.4th 189, 195 (1995); *Mixon v. FEHC*, 192 Cal.App.3d 1306, 1317 (1987).[111]

Accordingly, under FEHA, a plaintiff may establish a *prima facie* case of discrimination either by adducing direct evidence of discriminatory intent, or  by satisfying the first prong of the burden-shifting outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  See *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2004) ("For a *prima facie* case, Vasquez must offer evidence that 'give[s] rise to an inference of unlawful discrimination,' either through the framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory intent"); *Guz*, 24 Cal.4th at 354 ("This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially").[112]

---

[111]The California Legislature has clarified, however, that the ADA and analogous federal statutes provide a "floor" of protection above which California law may afford further protection. Government Code § 12926.1, enacted in 2000, codified this principle in response to *Cassista*, 5 Cal.4th 1050.  8 B. Witkin, SUMMARY OF CALIFORNIA LAW § 936 at 449 (10th ed. 2005) (citing CAL. GOV'T CODE § 12926.1(d)).  Thus, for example, although FEHA's definitions of "physical disability" and "mental disability" require "limitation" of a major life activity, the limitation need not be "substantial" (as it must be under the ADA).  Similarly, "whether a condition limits a major life activity shall be determined without respect to any mitigating measures, unless the mitigating measure itself limits a major life activity, regardless of federal law" under the ADA. Witkin, *supra*, at 449 (quoting CAL. GOV'T CODE § 12926.1(c)).  "Working" is considered a "major life activity, regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments."  *Id.* (quoting CAL. GOV'T CODE § 12926.1(c)).

[112]See also, e.g., *Cordova v. State Farm Insurance Companies*, 124 F.3d 1145, 1148 (9th Cir. 1997) ("To establish a prima facie case, a plaintiff must offer evidence that 'give[s] rise to an inference of unlawful discrimination.' . . .  'The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas* . . . , or by more direct evidence of discriminatory intent'"); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) ("The prima facie case may be based either on a presumption arising from the

factors such as those set forth in *McDonnell Douglas Corp.* . . . or by more direct evidence of discriminatory intent"); *Heilman v. Memeo*, 359 Fed. Appx. 773, 776 (9th Cir. Nov. 20, 2009) (Unpub. Disp.) ("A plaintiff may also establish a prima facie case by 'providing direct evidence suggesting that the employment decision was based on an impermissible criterion'").

The Supreme Court has stated that where a plaintiff adduces direct evidence of discrimination, the *McDonnell Douglas* test is not applicable. See *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 506 (2002), overruled on other grounds by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("Moreover, the *McDonnell Douglas* framework does not apply where, for example, a plaintiff is able to produce direct evidence of discrimination"); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (noting that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination").

The Ninth Circuit, however, appears to view direct evidence as an alternative means for a plaintiff to establish a prima facie case under *McDonnell Douglas* in Title VII cases. See, e.g., *Vasquez*, 349 F.3d at 640 (stating that "[f]or a prima facie case," plaintiff must offer evidence supporting an inference of unlawful discrimination, "either through the framework set forth in *McDonnell Douglas* . . . or with direct or circumstantial evidence of discriminatory intent"); *Lowe v. City of Monrovia*, 775 F.2d 998, 1007 (9th Cir. 1985) ("Because Lowe has met the four-part *McDonnell Douglas* requirements and alternatively because she has provided direct and circumstantial evidence of discriminatory intent, she established a prima facie case of disparate treatment on the basis of race"). It appears to have limited the application of *Trans World* and *Swierkiewicz* to age discrimination claims only. See *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004) ("When a plaintiff alleges disparate treatment based on direct evidence in an ADEA claim, we do not apply the burden-shifting analysis set forth in [*McDonnell Douglas*] in determining whether the evidence is sufficient to defeat a motion for summary judgment"); *Adam v. Kempthorne*, 292 Fed. Appx. 646, 650-51 (9th Cir. Sept. 9, 2008) (Unpub. Disp.) ("The employees argue that the district court erred in applying the *McDonnell Douglas* analysis because they presented direct, rather than circumstantial, evidence of discrimination. When a plaintiff presents direct evidence in support of an ADEA claim, the *McDonnell Douglas* analysis is unnecessary because the direct evidence allows the plaintiff to proceed directly to the question of whether the employer intentionally discriminated because of the plaintiff's age. . . . Although the district court did apply the *McDonnell Douglas* analysis, we nonetheless affirm because the mode of analysis made no difference to the ultimate question."); see also *Dayton v. Modesto Irrigation Dist.*, CV 06-1076 LJO, 2007 WL 4107904, *4 (E.D. Cal. Nov. 16, 2007) (stating with respect to an age discrimination claim under FEHA and the ADEA that "[t]he *McDonnell Douglas* test is not used, however, where direct evidence of discrimination exists").

In cases alleging other forms of discrimination, by contrast, direct evidence of discrimination serves only to establish plaintiff's *prima facie* case of discrimination, which is the first prong of the *McDonnell Douglas* burden-shifting test. See *Vasquez*, 349 F.3d at 640 (race discrimination under Title VII); *Withers v. Hearst Corp.*, 141 F.3d 1183, 1998 WL 87627, *1 (9th Cir. Feb. 26, 1998) (Unpub. Disp.) (describing the burden-shifting analysis in a disparate treatment case, and stating that "[a] prima facie case may be established either by a presumption arising from factors such as those set forth in [*McDonnell Douglas*], or by direct evidence of

In *McDonnell Douglas Corp.*, the Supreme Court held that the plaintiff bears the initial burden of establishing by a preponderance of the evidence a *prima facie* case of improper discrimination. If plaintiff succeeds in proving a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action. Should defendant carry this burden of production, the burden of proof shifts back to the plaintiff to demonstrate that defendant's asserted reason is pretextual. *McDonnell Douglas Corp.*, 411 U.S. at 802, 804. See also *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981).

Thus, a plaintiff seeking to defeat summary judgment must establish a *prima facie* case and, once defendant has articulated a legitimate, nondiscriminatory reason for its action, raise a triable issues of fact as to whether the articulated reason is pretextual. *Sischo-Nownejad v. Merced Community College District*, 934 F.2d 1104, 1110 (9th Cir. 1991); see also *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917-918 (9th Cir. 1997) ("[t]o . . . survive summary judgment, [plaintiff] must produce enough evidence to allow a reasonable factfinder to conclude either: (a) that the alleged reason for [plaintiff's] discharge was false, or (b) that the true reason for his discharge was a discriminatory one").

## 2. Whether Jacobson Has Adduced Direct Evidence of Discrimination

Direct evidence is "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Vasquez*, 349 F.3d at 640 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (alterations original)). See also *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir. 1999) (direct evidence is "'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly

_____

discriminatory intent,'" citing *Trans World*, 469 U.S. at 121); *Cordova*, 124 F.3d at 1148 (applying burden-shifting in a Title VII case and stating that "[t]o establish a prima facie case, a plaintiff must offer evidence that 'give[s] rise to an inference of unlawful discrimination.' . . . 'The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas* . . . , or by more direct evidence of discriminatory intent,'" quoting *Wallis*, 26 F.3d at 889).

reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision,'" quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993)).

"When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Godwin*, 150 F.3d at 1221. Stated differently, when a plaintiff relies on direct evidence of discrimination, courts "require very little evidence to survive summary judgment." *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009); see also *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004) ("[A]ny indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder," quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir.1996)).

Plaintiff has adduced direct evidence of discrimination in the form of comments by his supervisors, Trailor and Armstrong. Specifically, he has proffered evidence that after he informed them of his disability, Armstrong told him to quit, stating: "'We can't - - if we fire you, you can sue us. Why don't you just quit.'"[113] He has also proffered evidence that Trailor and Armstrong made fun of his disability and suggested that he was faking it.[114] Plaintiff has testified that his supervisors made sarcastic comments about his orthopedic shoes, his decision not to participate in work-related social events, and the fact that he allowed the "girls" to lift heavy boxes of supplies.[115]

Courts in this circuit have found this kind of direct evidence sufficient to make out a *prima facie* case of employment discrimination. See *Boeing Co.*, 577 F.3d at 1049-50 ("Foster testified that Charlton, Castron's supervisor, frequently made demeaning and derogatory comments about women. These comments, considered along with Charlton's interactions with Castron over the course of her employment at Boeing, are sufficient to create an inference of discriminatory motive

---

[113]Jacobson Depo. at 229:13-23.

[114]*Id.* at 277-278.

[115]*Id.*

even though the comments were not directed specifically at Castron or made in regard to decisions about her employment"); *Ankeny v. Napolitano*, No. C09-1379-JCC, 2010 WL 5094687, *2 (W.D. Wash. Dec. 7, 2010) ("The Ninth Circuit has 'repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer,'" citing *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005) ("Furthermore, in this circuit, we have repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer. See, e.g., *Chuang* [*v. Univ. of Cal. Davis Bd. of Trustees*], 225 F.3d [1115,] 1128 [(9th Cir. 2000)] (holding that a decisionmaker's remark that 'two Chinks in the pharmacology department were more than enough was an egregious and bigoted insult . . . that constitutes strong evidence of discriminatory animus on the basis of national origin'); *Cordova*[,] . . . 124 F.3d . . . 1149 . . . (holding that an employer's reference to an employee as a 'dumb Mexican' 'could be proof of discrimination against [plaintiff] despite their reference to another agent and their utterance after the hiring decision')"); cf. *Enlow*, 389 F.3d at 812 ("Direct evidence, in the context of an ADEA claim, is defined as evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision" (citations omitted)).

As plaintiff has proffered direct evidence of discrimination on the part of his supervisors, he has made out a *prima facie* case of discrimination.

### 3.    Regis' Non-Discriminatory Reason for Taking Adverse Employment Action

Since plaintiff has established a *prima facie* case of disability discrimination, the burden shifts to Regis to articulate a legitimate, non-discriminatory reason for its adverse employment action. *Burdine*, 450 U.S. at 255. Regis has adduced evidence that plaintiff was terminated for violating his non-competition agreement by working for Yuki Sharoni while he was on medical leave from Carlton.

This evidence suffices to articulate a legitimate, nondiscriminatory reason for plaintiff's

36

termination. See *Mathieson v. Yellow Book Sales and Distribution Co., Inc.*, Civ. No. 07-6090-AA, 2008 WL 2889398, *5 (D. Or. July 21, 2008) (the fact that an employee is working for a competitor while on leave is a legitimate, nondiscriminatory reason for terminating him); see also *Dumas v. New United Motor Mfg., Inc.*, 305 Fed. Appx. 445, 448 (9th Cir. Dec. 29, 2008) (Unpub. Disp.) ("NUMMI proffered a legitimate, non-discriminatory reason for terminating Mr. Dumas – his violation of company policy requiring written permission for extended leaves of absence"); *Franyutti v. Price Co., Inc.*, 42 F.3d 1399, 1994 WL 616536, *2 (9th Cir. Nov. 4, 1994) (Unpub. Disp.) ("An employer may rebut an employee's claim by producing evidence of a legitimate, nondiscriminatory reason for the employee's termination. . . . Here, the Company explained that it terminated Franyutti for violating two company rules. . . . Accordingly, we agree with the district court's ruling that defendants gave legitimate and non-discriminatory reasons for terminating Franyutti. . ."); *Alfonso v. Tri-Star Search LLC*, No. CV-07-1208-ST, 2009 WL 1227769, *10 (D. Or. May  4, 2009) ("As to Alfonso's termination, Tri-Star also meets its burden.  Bellinazzo has provided a legitimate non-discriminatory reason for terminating Alfonso, namely, for disloyalty after it came to light that she had soured the morale of Edera and attempted to recruit him to another company"); *Cozza v. Northrop Grumman Corp.*, 41 F.Supp.2d 1089, 1094 (C.D. Cal. 1999) ("The undisputed facts, therefore, demonstrate that plaintiff engaged in violations of company policy.  Northrop has demonstrated that it had a legitimate, nondiscriminatory basis for plaintiff's termination"); *Phipps v. Gary Drilling Co., Inc.*, 722 F.Supp. 615, 621 (E.D. Cal. 1989) ("Poor work performance, including violations of company policy, certainly would constitute ample justification for disciplining or terminating employees without running afoul of the proscriptions of either state or federal age discrimination laws.").

### 4. Whether Jacobson Has Raised Triable Issues of Fact Regarding Pretext

Because Regis has adduced evidence that it had a legitimate reason for terminating plaintiff, he must, to survive summary judgment, adduce evidence suggesting that Regis acted with discriminatory animus, or that its "proffered explanation is unworthy of credence." *Burdine*, 450

U.S. at 256; *Chuang*, 225 F.3d at 1127.[116]  "When [plaintiff's] evidence [of discriminatory animus] is direct, '[w]e require very little evidence to survive summary judgment' in a discrimination case."  *Boeing Co.*, 577 F.3d at 1049 (citing *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1564 (9th Cir. 1994) (in turn quoting *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991)).  When relying on circumstantial evidence to prove pretext, however, a plaintiff must produce specific and substantial evidence "that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable."  *Chuang*, 225 F.3d at 1222; see also *Morgan*, 88 Cal.App.4th at 75 ("An employee in this situation cannot simply show the employer's decision was wrong, mistaken, or unwise.  Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, . . . and hence infer that the employer did not act for the [. . . asserted] non-discriminatory reasons," quoting *Horn v. Cushman & Wakefield, Inc.*, 72 Cal.App.4th 798, 807 (1999) (internal quotations omitted)); see also *Guz*, 24 Cal.4th at 363 ("The authorities suggest that, in an appropriate case, an inference of dissembling may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions").

Plaintiff has adduced both direct and circumstantial evidence supporting his contention that Regis' proffered non-discriminatory reason for his termination was pretextual.  In *Boeing Co.*, the Ninth Circuit held that direct evidence of a supervisor's sexist comments was sufficient both to make out a *prima facie* case of sex discrimination and raise triable issues of fact regarding pretext. *Boeing*, 577 F.3d at 1049-50 ("The discriminatory animus exhibited by Castron's supervisor constitutes direct evidence of pretext, even though the comments did not refer specifically to

---

[116]The evidence on which plaintiff relies need not be different than that which supports his *prima facie* case.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000); *Snead v. Metropolitan Property & Casualty Ins. Co.*, 237 F.3d 1080, 1094 (9th Cir. 2001); *Chuang*, 225 F.3d at 1127.  As discussed *infra*, however, the quantum of evidence adduced must be greater than that proffered to establish a *prima facie* case.

Castron.  Based on Charlton's sexist comments, a jury might reasonably infer that Charlton's decision to transfer Castron, rather than a male coworker about whom she complained, to a new position where her job was less secure, may have resulted from improper motivations, including discriminatory intent, retaliatory intent, or both").

Plaintiff's testimony that Trailor and Armstrong repeatedly asked him to quit after he disclosed his disability, so that they would not have to fire him, is direct evidence from which a jury could find that Regis was searching for a way to sever its relationship with him because of his disability.  When combined with direct evidence of the harassing treatment to which plaintiff's supervisors allegedly subjected him as a result of his disability, this evidence, if believed, would provide a sufficient causal nexus between plaintiff's disability and his termination that a reasonable jury could find defendant's articulated reason for termination was pretextual.

Furthermore, here, as in *Boeing*, there is "specific and substantial" circumstantial evidence of discrimination.  First, the timing of plaintiff's termination supports his contention that the discharge decision was due to his disability.  Plaintiff returned from surgery on August 25, 2009, was placed on FMLA leave on October 8, 2009, and was formally terminated on November 10, 2009.  While an employee cannot rely solely on temporal proximity to establish pretext, it is one type of circumstantial evidence courts consider.  See *Arteaga v. Brink's, Inc.*, 163 Cal.App.4th 327, 353 (2008) ("[T]emporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination. . . .  This is not to say that temporal proximity is never relevant in the final step of the *McDonnell Douglas* test.  In the classic situation where temporal proximity is a factor, an employee has worked for the same employer for several years, has a good or excellent performance record, and then, after engaging in some type of protected activity – disclosing a disability – is suddenly accused of serious performance problems, subjected to derogatory comments about the protected activity, and terminated.  In those circumstances, temporal proximity, together with the other evidence, may be sufficient to establish pretext'").

In this regard, California courts look not only to "the timing of the company's termination decision," but also to "the identity of the person making the decision, and the terminated

employee's job performance before termination." *Flait v. North American Watch Corp.*, 3 Cal.App.4th 467, 479 (1992); see *Hanson v. Lucky Stores, Inc.*, 74 Cal.App.4th 215, 224 (1999). In this case, while it appears O'Regan made the ultimate decision to terminate plaintiff,[117] there is evidence that Trailor influenced the termination decision by reporting to Regis that Jacobson was working for Yuki Sharoni and by conducting further investigation of the report at Regis' request.[118] Because Trailor was involved in the termination process, evidence of discriminatory animus on her part is sufficient to raise triable issues as to whether the nondiscriminatory reason for termination was pretextual. See *Shabazz v. Oakland Unified School Dist.*, No. C 03-2071 VRW, 2005 WL 1513148, * 5 (N.D. Cal. June 22, 2005) ("In attempting show that the employer's proffered reason for not promoting her was pretextual, the *Bergene* plaintiff offered direct evidence that her former supervisor, Wilson, had informed her of his retaliatory intent towards her. The employer countered that Wilson was not the person ultimately responsible for determining whether to promote plaintiff and thus his bias could not negate the proffered legitimate reason for failure to promote plaintiff. The Ninth Circuit disagreed, stating that '[a]lthough Pratt, [plaintiff's] immediate supervisor, was ultimately responsible for selecting the [employee to be promoted], there [was] evidence that Wilson played an influential role in the selection process. Even if a manager was not the ultimate decisionmaker, that manager's retaliatory motive may be imputed to the company if the manager was involved in the hiring decision,'" citing *Beregne v. Salt Water Project Agricultural Improvement & Power District*, 272 F.3d 1136, 1141 (9th Cir. 2001) (in turn citing *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1459-60 (7th Cir. 1994)).

Moreover, the fact that Regis unilaterally placed plaintiff on FMLA leave, despite his expressed desire to continue working with accommodations, also suggests that his termination was discriminatory. Carlton's corporate sales and operations coordinator, O'Donnell, testified that she

---

[117]O'Donnell Depo at 27:2-16 ("James [O'Regan] instructed me to draft the letter and inform him of his termination due to the breach of contract.").

[118]*Id.* at 23:2-24:16.

did not believe plaintiff had asked to be placed on FMLA leave.[119]  Plaintiff, moreover, asserts that being placed on twelve weeks of FMLA leave was "career suicide," and that he was capable of performing his essential job functions, i.e., "do[ing] incredible haircuts and colors."[120]  He contends additionally that shampooing was not an essential part of his job, that Carlton had previously employed assistants to shampoo, and that, had he been given assistance shampooing for a few weeks, he would have been able to continue his work.[121]

Plaintiff maintains that after he received a letter stating that he had been placed on FMLA leave, he contacted Trailor, who told him that she would "send [him his] last check" and "send [him] back [his] license."[122]  He contends that when he asked Trailor why she was sending him his license, since he would be back in twelve weeks, she told him that they "both kn[e]w that [he] [was] not coming back in twelve weeks."[123]  Plaintiff interpreted this comment as an indication that he "was basically [being] . . . fired."[124]  If the jury were to credit plaintiff's testimony regarding this conversation and also conclude that he was capable of performing all essential job functions, it could reasonably find that Carlton placed him on leave because it did not want to accommodate his disability and/or because it was attempting to force Jacobson to quit so that it

---

[119]*Id.* at 21:4.

[120]Jacobson Depo. at 313:12-14.

[121]*Id.* at 340:24-345:6; Jacobson Decl., ¶¶ 18-20 ("Many clients have dry haircuts without shampooing.  Even if a client's hair required shampooing, I needed merely to be assisted for a few weeks after my surgery; I would have been able to conduct shampooing on my own thereafter. Shampooing can be done without bending and twisting because the haircutting chair moves up and down and easily turns 360 degrees for the convenience of the stylist. . . .  On October 8, 2009, . . . [Carlton] made no effort to discuss which of my job duties I needed accommodations for because I was capable of performing essential parts of my job duties and merely needed accommodation with my restrictions.  Shampooing hair was not an essential part of my job at Carlton").

[122]*Id.* at 394:2-5.

[123]*Id.* at 394:6-10.

[124]*Id.* at 394:15-16.

41

would not have to terminate him. This, in turn, would support a finding that plaintiff's formal termination, which occurred a month after he was placed on FMLA leave was pretextual. Consequently, the court denies Regis' motion for summary judgment on plaintiff's fourth claim for discrimination on the basis of disability.

**D.**     **Whether Regis is Entitled to Summary Judgment on Plaintiff's Fourth Claim for Retaliation Due to Physical Disability Under FEHA**

Regis argues that it is entitled to summary judgment on Jacobson's fourth cause of action to the extent it alleges that the company retaliated against plaintiff in violation of FEHA. Under FEHA, it an unlawful employment practice for any employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA]." CAL. GOV'T CODE § 12940(h). To establish a *prima facie* case of retaliation, a plaintiff must show (1) he engaged in a protected activity, (2) the employer subjected him to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. *Nazir v. United Airlines, Inc.*, 178 Cal.App.4th 243, 287 (2009) (citing *Miller v. Department of Corrections*, 36 Cal.4th 446, 472 (2005)).

State and federal courts in California have found that the following are protected activities under FEHA: (1) filing an administrative complaint or grievance, see *Barefield v. Board of Trustees of CA State University, Bakersfield*, 500 F.Supp.2d 1244, 1253 (E.D. Cal. 2007) (discrimination grievance filed with the California Faculty Association); *McRae v. Department of Corrections and Rehabilitation*, 142 Cal.App.4th 377, 386 (2006) ("It is not contested that Dr. McRae engaged in 'protected activity' – the filing of DFEH claims"); (2) making informal complaints to supervisors, see *Garcia v. Los Banos Unified School Dist.*, 418 F.Supp.2d 1194, 1224 (E.D. Cal. 2006) ("Plaintiff alleged and provided evidence reasonably warranting an inference that she complained to Elliott, Heid's superior, about Heid's sexually derogatory 'ass wiping' remark and his having yelled at her and raised his fist in a physically threatening way"); and (3) serving as a witness in a co-worker's FEHA proceeding, see *Steele v. Youthful Offender Parole Bd.*, 162 Cal.App.4th 1241, 1252 (2008) ("Kaslar filed a complaint with the DFEH based,

in part, on the YOPB retaliating against her for her report of the kissing incident involving Galindo and Lisa. Lisa was a 'potential witness' in such proceeding. Thus, Lisa was engaged in a protected activity so as to meet the first requirement for a claim of retaliation").

In his opposition, plaintiff argues that he "complained to O'Regan about Trailor's and Armstrong's frequent negative comments." He contends that "[i]n 2009, he called company headquarters to complain and was told to submit a written complaint, which would be directed to the 'appropriate person.' [Thereafter,] [h]e submitted written complaints, but defendant [purportedly] took no action to stop [his supervisors'] mistreatment. . . ." The evidence he cites in support of this argument, however, refers not to complaints about mistreatment on the basis of disability, but rather complaints about defendant's continuing education policy[125] and Armstrong's and Trailor's comments concerning his Iraqi heritage.[126] Plaintiff cites no evidence that he complained to management specifically regarding mistreatment or harassment due to his disability.[127] Because plaintiff has adduced no evidence that he engaged in protected activity related to his disability by "oppos[ing] . . . practices forbidden under" FEHA or by "fil[ing] a complaint, testif[ying], or assist[ing] in a[ ] proceeding under" FEHA, he has failed to prove a *prima facie* case of retaliation based on disability. Defendant is therefore entitled to have summary judgment entered in its favor on this aspect of plaintiff's FEHA disability claim.

[125]Jacobson Depo at 178:5-179:20 (Q: "[D]id you ever complain in writing about the requirement to take classes? A: I did."); *id.* at 181:2-3 ("I would complain about being harassed for not taking classes").

[126]*Id.* at 181:3-5 ("I would complain about being made fun of because being – having Middle Eastern – whatever."); *id.* at 261:21-262:18 (Q: "We were also talking about the ways in which you thought you were treated less favorably because you were Iraqi . . . . Did you ever report this to anybody at Carlton or Regis? A: Yes. . . . I would complaint to James, but all that would do really would cause more retaliation.").

[127]At the January 24, 2011 hearing, plaintiff's counsel asserted that his client had testified at his deposition regarding complaints he made about disability discrimination. Plaintiff has failed to cite testimony about complaints regarding disability discrimination, as opposed to the mandatory class policy and race discrimination, and the court finds no such testimony in the summary judgment record.

**E.** **Whether Regis is Entitled to Summary Judgment on Plaintiff's Fourth Claim Under FEHA for Failure to Engage in the Interactive Process and Accommodate Plaintiff's Disability**

**1.** **Failure to Engage in the Interactive Process**

Regis argues that it is entitled to summary judgment on Jacobson's fourth cause of action to the extent it alleges that the company failed to engage in a good faith, interactive process. Regis asserts that it "did everything lawfully required to accommodate Plaintiff's alleged physical condition and worked with him to determine how to best accommodat[e] the ever-changing needs he voiced."[128]

Under FEHA, an employer commits an unlawful employment practice if it fails to engage in a timely, good faith, interactive process to determine effective, reasonable accommodations, if any, in response to a request for accommodation by an employee "with a known physical or mental disability or known medical condition." CAL. GOV'T CODE § 12940(n). As interpreted in *Gelfo v. Lockheed Martin Corp.*, 140 Cal.App.4th 34, 61 n. 21 (2006), "FEHA's reference to a 'known' disability . . . mean[s] a disability of which the employer has become aware, whether because it is obvious, the employee has brought it to the employer's attention, it is based on the employer's own perception – mistaken or not – of the existence of a disabling condition, or . . . the employer has come upon information indicating the presence of a disability." If an employee requests accommodation, and his employer fails to engage in the interactive process, the employee may file a civil action complaining of the failure.[129]

---

[128]Motion at 20.

[129]"Failure to engage in [the interactive] process is a separate FEHA violation independent from an employer's failure to provide a reasonable disability accommodation, which is also a FEHA violation." See *Wysinger v. Automobile Club of Southern California*, 157 Cal.App.4th 413, 424 (2007) (citations omitted); *Claudio v. Regents of University of California*, 134 Cal.App.4th 224, 243 (2005) (referencing CAL. GOV'T CODE § 12965, which authorizes the filing of a civil action based on "an unlawful practice"); *Schermerhorn v. Los Angeles Unified School District*, No. B196937, 2008 WL 4277453, *6 (Cal. App. Sept. 19, 2008) (Unpub. Disp.) (citing *Claudio*).

The *Wysinger* court noted: "Federal ADA cases are generally helpful in interpreting

The elements of a claim for failure to engage in the good faith interactive process are as follows:

> "[An] employee triggers the employer's obligation to participate in the interactive process by requesting an accommodation. [CAL. GOV'T CODE § 12940(n).] Although it is the employee's burden to initiate the process, no magic words are necessary, and the obligation [to engage in the interactive process] arises once the employer becomes aware of the need to consider an accommodation. Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party. Liability hinges on the objective circumstances

---

FEHA. But not where they undermine provisions of California law that provide more protections to employees than the ADA. . . . No provision in the ADA imposes liability on employers who refuse to engage in the interactive process. . . . An employee who proves such bad-faith employer conduct [under the ADA] has no remedy unless he or she also shows that his or her disability could have been reasonably accommodated. . . . By contrast, FEHA allows an independent cause of action for employees whose employers fail to engage in the interactive process. This provision does not require proof of the elements required by the ADA." *Wysinger*, 157 Cal.App.4th at 425 (citations omitted). But see, e.g., *Hurley v. Pechiney Plastic Packaging, Inc.*, No. C 05-05028 JSW, 2006 WL 708656, *5 (N.D. Cal. Mar. 16, 2006) ("The standard for FEHA violations for failure to engage in the interactive process tracks the standard for the ADA violations," citing *Velente-Hook v. Easter Plumas Health Care*, 368 F.Supp.2d 1084, 1097 (E.D. Cal. 2005)).

The exact contours of and limitations on a FEHA "interactive process" claim are still evolving, however. For example, the California Courts of Appeal are split as to whether employer liability on an "interactive process" claim depends upon a showing that a reasonable accommodation for plaintiff's disability was available. Compare *Nadaf-Rahov v. Neiman Marcus Group, Inc.*, 166 Cal.App.4th 952, 980-85 (2008) (holding that failure to engage in the good faith interactive process is unlawful only if a reasonable accommodation is possible, and that this is a matter on which the employee bears the burden of proof) with *Wysinger*, 157 Cal.App.4th at 425 (holding that employer liability for failure to engage in the good faith interactive process does not depend on showing that a reasonable accommodation was possible); see also *Gelfo*, 140 Cal.App.4th at 55 ("Two principles underlie a cause of action for failure to provide a reasonable accommodation. First, the employee must request an accommodation. . . . Second, the parties must engage in an interactive process regarding the requested accommodation and, if the process fails, responsibility for the failure rests with the party who failed to participate in good faith. . . . While a claim of failure to accommodate is independent of a cause of action for failure to engage in an interactive dialogue, each necessarily implicates the other" (citations omitted)).

surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith." *Gelfo*, 140 Cal.App.4th at 62 n. 22 (citing, *inter alia*, *Jenson v. Wells Fargo Bank*, 85 Cal.App.4th 245 (2000)).

Having reviewed the record, the court concludes that triable questions of material fact remain regarding plaintiff's claim that Regis failed to engage in the interactive process. Defendant does not appear to dispute that plaintiff had a "known disability" that triggered obligations under FEHA. It is undisputed that plaintiff gave both his supervisors and Regis' corporate officers information regarding his back condition. There are, however, genuine issues of material fact as to whether Regis failed to engage in a good faith, interactive process with plaintiff after receiving the information.

Resolving all factual disputes in favor of plaintiff, there is evidence that he requested an accommodation – assistance with shampooing – which defendant denied without substantive discussion. Jacobson purportedly told Trailor he was unable to bend or twist; he asserts he asked her to (1) hire an assistant for him; (2) allow him personally to hire an assistant; or (3) ask other stylists to assist him with shampoos. Plaintiff contends these requests were rejected. Specifically, he contends that Trailor told him Carlton "[was] not going to hire someone because [he] need[ed] someone to shampoo for [him]"[130] and that "[i]f [he was] going to work [at Carlton], [he] ha[d] to do everything like everybody else. [He had] to do [his] own shampoos like every other stylist [at Carlton]."[131] Plaintiff asserts that one other stylist helped him shampoo "a few times," but that Armstrong did not prepare the schedule so that there would always be someone available to assist him.[132] Although there is contrary evidence in the record – i.e., that Trailor told plaintiff to have other stylists help him until she was able to hire an assistant for the salon as a whole, that she saw plaintiff shampooing a client's hair after he had asked another stylist for help because he did not

---

[130]Jacobson Depo. at 274:2-7.

[131]*Id.* at 348:25-349:3.

[132]*Id.* at 345:7-347:9.

want to wait for the stylist, and that she reminded him of his restrictions and asked him to observe them – the issue is clearly disputed. Therefore, summary judgment cannot properly be entered on Jacobson's failure to engage in the interactive process claim. See, e.g., *Gelfo*, 140 Cal.App.4th at 62 n. 23 ("Because the evidence is conflicting and the issue of the parties' efforts and good faith is factual, the claim is properly left for the jury's consideration"); *Claudio*, 134 Cal.App.4th at 248 ("A jury should decide the question whether the University failed to engage in the interactive process in good faith when it refused to communicate with plaintiff's attorney. . . . A triable issue of fact exists with respect to whether the University wrongfully failed to engage in the interactive process required by FEHA").[133] Thus, Regis' motion for summary judgment on this claim is denied.

## 2. Failure to Accommodate

There are likewise triable issues regarding plaintiff's claim for failure to accommodate in violation of Government § 12940(m). This statute makes it an unlawful employment practice "[f]or an employer or other covered entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee. Nothing in this subdivision or in . . . subdivision (a) shall be construed to require an accommodation that is demonstrated by the employer or other covered entity to produce undue hardship to its operation."

---

[133]At the January 24, 2011 hearing, defense counsel argued that it was undisputed that Trailor and Armstrong communicated with plaintiff and attempted to accommodate his requests for a reduced work schedule. The court agrees. Plaintiff repeatedly acknowledged in his deposition that he was allowed to work a reduced schedule prior to his back surgery and after he returned. This does not, however, merit judgment in defendants' favor on the interactive process claim, however. Plaintiff has proffered sufficient evidence from which a jury could find that Trailor and Armstrong flatly refused to accommodate his request for assistance with shampooing, however. This evidence includes testimony that Trailor and Armstrong told plaintiff that "[i]f [he was] going to work [at Carlton], [he] ha[d] to do everything like everybody else. [He had] to do [his] own shampoos like every other stylist [at Carlton]." (Jacobson Depo at 348:25-349:3). Despite defendants' contrary evidence, plaintiff's evidence raises triable issues of fact as to whether defendants engaged in the interactive process with respect to plaintiff's various requests for accommodation. The conflicting evidence creates a factual dispute that must be resolved by a jury.

"In order to establish a FEHA claim for failure to make reasonable accommodat[ion], a plaintiff must show that, at the time of the alleged failure, (1) he had a disability of which the employer was aware, (2) he was able to perform the essential functions of the job at issue with or without accommodation, i.e., that he was qualified individual, and (3)[ ] the employer failed to reasonably accommodate . . . his disability." *Jadwin v. County of Kern*, 610 F.Supp.2d 1129, 1175-76 (E.D. Cal. 2009). "Unlike . . . a claim for employment discrimination, a plaintiff need not establish that an adverse employment action was caused by the plaintiff's disability because, as stated, a FEHA claim for failure to accommodate is an independent cause of action." *Diaz v. Federal Express Corp.*, 373 F.Supp.2d 1034, 1054 (C.D. Cal. 2005).

As noted, the parties agree that plaintiff had a disability of which Regis was aware. Regis, however, disputes that plaintiff was able to perform the essential functions of a hairstylist and that it failed reasonably to accommodate his disability. It contends that plaintiff's inability to twist and bend prevented him from performing an essential job function, namely, shampooing his clients' hair. Plaintiff has proffered evidence, however, that Carlton had previously employed assistants to shampoo clients' hair, suggesting that shampooing was not an essential job function of a stylist. Plaintiff, moreover, has testified that he understood the essential job functions of a stylist to be "do[ing] incredible haircuts and colors."[134] Thus, a reasonable jury, viewing all facts in the light most favorable to plaintiff, could conclude that Jacobson was a qualified stylist capable of performing all essential job functions.

The reasonableness of an accommodation is generally a question of fact for the jury. *Hanson v. Lucky Stores*, 74 Cal.App.4th 215, 228 n. 11(1999) ("the reasonableness of an accommodation is generally a factual question"); *Prilliman v. United Air Lines*, 53 Cal.App.4th 935, 953-954 (1997) ("Ordinarily, the reasonableness of an accommodation is an issue for the jury."). "The law and its regulations make clear that the term 'reasonable accommodation' is to be interpreted flexibly. The regulations provide a non-exhaustive list of accommodations that includes not only making premises accessible but also '[j]ob restructuring, assignment or transfer,

---

[134]Jacobson Depo. at 313:12-14.

[and] part-time or modified work schedules. . . .' CAL. CODE REG. § 7293.9. The law and the regulations clearly contemplate not only that employers remove obstacles that are in the way of the progress of the disabled, but that they actively re-structure their way of doing business in order to accommodate the needs of their disabled employees." *Sargent v. Litton Systems, Inc.*, 841 F.Supp. 956, 961 (N.D. Cal. 1999). Plaintiff has proffered evidence that he asked Trailor to (1) hire an assistant for him; (2) allow him personally to hire an assistant; and/or (3) direct other stylists to assist Jacobson with his shampoos. He contends that these requests were rejected. Because a reasonable jury could conclude that FEHA required Regis to implement one or more of the requested accommodations, the court cannot grant summary judgment on this claim.

**F.** **Whether Regis is Entitled to Summary Judgment on Plaintiff's Fifth Claim for Discrimination Based on Ancestry and National Origin under FEHA**

Regis has also moved for summary judgment on plaintiff's fifth claim for discrimination due to his Iraqi heritage. It does not seek summary judgment on plaintiff's racial harassment claim.

**1.** **Whether Jacobson Has Adduced Direct Evidence of Race Discrimination**

As noted, direct evidence is "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Vasquez*, 349 F.3d at 640. "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Dominguez-Curry*, 424 F.3d at 1038; see also *Walton*, 167 F.3d at 426 (direct evidence is "'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision,'" (citation omitted)).

Plaintiff has adduced evidence of discriminatory comments made by his supervisors regarding his Iraqi heritage and people of Middle Eastern descent.[135] Plaintiff asserts that Trailor commented that he should legally change his last name from Mahmoud and should not use that

---

[135]See *id.* at 230:12-231:25; 239:22-240:8; 219:15-220:4.

49

name professionally to avoid offending clients.[136]  These comments allegedly began soon after Jacobson was hired, and continued through his tenure at Carlton.  Plaintiff asserted Trailor "would constantly remind [him], 'Are you going to change your name? . . . [W]hen are you going to do that?  What is happening with that?"[137]  He testified that he waited three years, "hoping [Trailor] would let it go and stop . . . harassing [him] about it[,]" but eventually, in 2009, after three years of comments by Trailor, he formally changed his name to Sam Jacobson.[138]  Plaintiff also testified that Trailor told him she disliked having Middle Eastern clients in the salon and that Armstrong made statements regarding their smell, poor tipping habits, and the futility of cutting their hair because all Middle Eastern women wore burqas.[139]

This kind of direct evidence is sufficient to prove a *prima facie* case of race discrimination. *Flores v. Merced Irr. Dist.*, __ F.Supp.2d __, 2010 WL 5113050, *10 (E.D. Cal. Dec. 9, 2010) ("Here, the Court finds that plaintiff produced some direct evidence as to his discrimination claims. There is direct evidence of possible racial animus.  For instance, racially derogatory terms were used by coworkers and used to refer to plaintiff in particular.  Plaintiff has been referred to as 'wetback'"); see also *Chuang*, 225 F.3d at 1128 (evidence that a decisionmaker used the term "chinks" and told the plaintiffs "that they 'should pray to [their] Buddha for help'" were "egregious and bigoted insult[s], . . . that constitute[ ] strong evidence of discriminatory animus on the basis of national origin"); *Cordova*, 124 F.3d at 1149 (discussing an allegation that the employer referred to another employee as a "dumb Mexican").  As noted, the Ninth Circuit has "repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer." *Dominguez-Curry*, 424 F.3d at 1039; see also *Boeing Co.*, 577 F.3d at 1049-50 ("Foster testified that Charlton, Castron's

---

[136]*Id.* at 230:12-231:25.

[137]*Id.* at 233:14-17.

[138]*Id.* at 234:7-19.

[139]*Id.* at 239:22-240:8; 219:15-220:4.

supervisor, frequently made demeaning and derogatory comments about women. These comments, considered along with Charlton's interactions with Castron over the course of her employment at Boeing, are sufficient to create an inference of discriminatory motive even though the comments were not directed specifically at Castron or made in regard to decisions about her employment"); cf. *Enlow*, 389 F.3d at 812 ("Direct evidence, in the context of an ADEA claim, is defined as evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer"s decision" (citations omitted)).

Plaintiff has proffered evidence of more than a single discriminatory statement by his supervisors. Indeed, were a jury to credit his testimony, it could find that plaintiff had endured three years of near continuous harassment on the basis of his Iraqi heritage. Plaintiff has thus proved a *prima facie* case of race discrimination and the burden shifts to defendant to articulate a legitimate, non-discrmininatory rationale for its termination decision.

### 2. Regis' Non-Discriminatory Explanation

As with plaintiff's disability discrimination claim, Regis has met its burden of articulating a legitimate, non-discriminatory reason for the adverse employment action it took. Specifically, defendant has adduced evidence that plaintiff was terminated for violating his non-competition agreement by going to work for Yuki Sharoni while on medical leave from Carlton.

### 3. Whether Jacobson Has Raised Triable Issues of Fact Regarding Pretext

Because Regis has adduced evidence that it had a legitimate non-discriminatory reason for the termination decision, plaintiff must, to survive summary judgment, adduce evidence suggesting that Regis acted with discriminatory animus, or that its "proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. "When the evidence [of discriminatory animus] is direct, [the Ninth Circuit] 'require[s] very little evidence to survive summary judgment' in a discrimination case." *Boeing Co.*, 577 F.3d at 1049. When relying on circumstantial evidence to prove pretext, however, a plaintiff must adduce specific and substantial evidence "that tends to show that the employer's proffered motives were not the actual motives because they are

51

inconsistent or otherwise not believable." *Chuang*, 225 F.3d at 1222.

Plaintiff has adduced both direct and circumstantial evidence supporting his contention that Regis' proffered non-discriminatory reason for terminating him was pretextual. Plaintiff's testimony that Trailor and Armstrong repeatedly made derogatory remarks regarding his Iraqi heritage, told him to lie to clients about his ancestry so as not to offend them, and harassed him repeatedly about changing his last name from Mahmoud to Jacobson is direct evidence from which a jury could find that the supervisors were motivated by discriminatory animus. *See Boeing*, 577 F.3d at 1049-50 ("The discriminatory animus exhibited by Castron's supervisor constitutes direct evidence of pretext, even though the comments did not refer specifically to Castron. Based on Charlton's sexist comments, a jury might reasonably infer that Charlton's decision to transfer Castron, rather than a male coworker about whom she complained, to a new position where her job was less secure, may have resulted from improper motivations, including discriminatory intent, retaliatory intent, or both").

Additionally, there is "specific and substantial" circumstantial evidence of discrimination. As with plaintiff's claim for disability discrimination, plaintiff has proffered evidence that the harassing and derogatory statements regarding his Iraqi ancestry continued throughout 2009, up to the time of his termination in November 2009. Plaintiff testified that the harassment to which he was subjected, including "comments about the Middle East", "got worse after [his] surgery" in August 2009, just a few months before he was placed on FMLA leave and then formally terminated.[140] Moreover, there is sufficient evidence from which a jury could find that Trailor, who allegedly made repeated derogatory and harassing statements during her three years as plaintiff's supervisor, was intimately involved in investigating whether plaintiff had violated the non-competition clause and in initiating plaintiff's termination. *See Shabazz*, 2005 WL 1513148 at *5 ("Even if a manager was not the ultimate decisionmaker, that manager's retaliatory motive may be imputed to the company if the manager was involved in the hiring decision" (citations omitted)). This circumstantial evidence, combined with the direct evidence of discrimination and

---

[140]*Id.* at 259:2-260:18.

harassment plaintiff has adduced, would support a finding that Regis acted with discriminatory animus in terminating him. Consequently, the court denies Regis' motion for summary judgment on plaintiff's fifth claim for discrimination based on ancestry or national origin.

### G. Whether Regis is Entitled to Summary Judgment on Plaintiff's Fifth Claim for Retaliation Based on Ancestry and National Origin under FEHA

Regis also seeks summary judgment on plaintiff's fifth claim to the extent it alleges Regis retaliated against him for complaining about the racial harassment to which he was purportedly subjected. As noted, to establish a *prima facie* case of retaliation, plaintiff must show that (1) he engaged in protected activity, (2) defendant subjected him to an adverse employment action, and (3) there was a causal link between the protected activity and the employer's action. *Nazir*, 178 Cal.App.4th at 287.

Unlike plaintiff's retaliation claim based on disability, plaintiff has proffered evidence that he complained to O'Regan and Regis about the harassment he suffered as a result of his Iraqi heritage. At his deposition, plaintiff answered "Yes" when questioned whether he had ever complained to Carlton and Regis about "the ways in which [he] thought [he] [was] treated less favorably because [he] [was] Iraqi."[141] He stated that when "[Armstrong] would make comments, [he went] to [Trailor], and . . . when [Trailor] would . . . make comments together [with Armstrong] . . . [he complained to] . . . [O'Regan]."[142] Plaintiff asserted that he even "call[ed] the headquarters . . . and [asked], 'Is there anybody else above [O'Regan] that I can complain to[?]' [And then he] . . . faxed [the complaints] to the main office."[143] These kind of internal complaints suffice to raise triable issues of fact as to whether plaintiff engaged in protected activity. See *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 525 (9th Cir. 1994) (holding that plaintiff engaged in protected activity by "complain[ing] about the offensive remarks to Richard Burasco, VEA's office manager," and after being "asked . . . to put her complaint in writing[,] . . .

---

[141]Jacobson Depo at 261:21-263:12.

[142]*Id.*

[143]*Id.*

53

submitt[ing] a written report to Ross Dohlen, VEA's general manager and [speaking] with him about the safety meeting incident. . ."); *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1009 (9th Cir. 1983) (holding that employees engaged in protected activity by writing "letters to elected officials at the federal, state, and local levels," and by sending "a letter to C.R. Dahl, the board chairman of Crown Zellerbach Corporation, Zellerbach's parent, complaining of discrimination against blacks and inadequate affirmative action in the warehouse").

It is undisputed that plaintiff's termination constituted adverse employment action. The court must assess, however, whether plaintiff has raised triable issues concerning the fact that "a causal link existed between the protected activity and the employer's action." To infer a causal nexus between an employee's protected activity and adverse employment action on the basis of temporal proximity, the adverse action must follow "within a relatively short time" after the protected activity. *Loggins v. Kaiser Permanente Intern.*, 151 Cal.App.4th 1102, 1110 (2007). Although plaintiff could not remember the exact dates of his complaints, he testified that he complained to O'Regan regarding the harassment and faxed complaints to the main office in 2009.[144] This, combined with his testimony that the harassment, including "comments about the Middle East", got worse after he returned from back surgery in late August 2009, and his testimony that he sent formal complaints in the "later part of 2009," indicates that a reasonable jury could find that he engaged in protected activity within a few months of his termination. While at least one court has suggested that a nine-month period between protected activity and adverse employment consequences is not sufficiently proximate to prove a *prima facie* case of retaliation, see *Loggins*, 151 Cal.App.4th at 1110 n. 2, a few months window would be sufficiently proximate to support a *prima facie* case of retaliation. See *Flait v. North American Watch Corp.*, 3 Cal.App.4th 467, 477-478 (1992) (evidence that an employee who had worked for an employer for four years was terminated only a few months after protected activity was sufficient circumstantial evidence of a causal link); see also *Terry v. City of San Diego*, 380 Fed. Appx. 591, 594 (9th Cir. May 21, 2010) (Unpub. Disp.) ("While we have rejected an inference of causality

---

[144]*Id.* at 263:8-21.

54

when 18 months pass between the protected activity and the adverse employment action, *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002), we do not require that retaliation take place immediately in order to infer a causal connection. See, e.g., *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000). Because of the seasonal nature of non-permanent lifeguard work, we hold that the fact that Terry was scheduled during the 2006 summer season, but received no work during the 2007 summer season is no different than an employer waiting *a few months* before firing an employee who engaged in a protected activity" (emphasis added)). As plaintiff has testified that he made complaints in the "later part of 2009" regarding his supervisors' racially derogatory remarks, the court concludes for purposes of this motion that he has shown his complaints were sufficiently proximate to prove a *prima facie* case of retaliation.

Once an employee establishes a *prima facie* case of retaliation, the employer is required to offer a legitimate, non-retaliatory reason for taking adverse employment action; if the employer identifies a legitimate reason, the presumption of retaliation "drops out of the picture," and the burden shifts back to the employee to prove intentional retaliation. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1042 (2005). Regis has met its burden of proffering evidence that plaintiff was terminated for violating the parties' non-competition agreement. Thus, the burden shifts back to plaintiff to adduce evidence that Regis' non-discriminatory reason was pretextual. The court agrees with defendant that plaintiff has failed to meet this burden. Plaintiff has adduced no evidence, other than possible temporal proximity, from which a jury could infer that he was terminated as a result of internal complaints regarding mistreatment on the basis of ancestry. While temporal proximity suffices to prove a *prima facie* case, "temporal proximity does not alone satisfy" plaintiff's burden of adducing evidence of pretext. *Nadaf-Rahrov v. Neiman Marcus Group, Inc.*, 166 Cal.App.4th 952, 990 (2008) (assuming that temporal proximity suffices to make out a *prima facie* case but holding that it is not enough evidence of pretext to defeat summary judgment). As plaintiff has failed to adduce any other evidence suggesting a causal nexus between his protected activity and his termination, the court grants summary judgment in defendant's favor on plaintiff's retaliation based on race claim.

### H.  Whether Regis is Entitled to Summary Judgment on Plaintiff's Claim for Wrongful Termination in Violation of Public Policy

Regis next seeks summary judgment on plaintiff's third claim for wrongful termination in violation of public policy.  It contends that plaintiff was terminated for reasons unrelated to any public policy.  "An employer may not discharge an at will employee for a reason that violates fundamental public policy." *Stevenson v. Superior Court of Los Angeles County*, 16 Cal.4th 880, 887 (1997).  Claims of wrongful termination in violation of public policy generally fall into one of four categories: the employee was terminated because (1) he refused to violate a statute; (2) he performed a statutory obligation; (3) he exercised a constitutional or statutory right or privilege; or (4) he reported a statutory violation for the public's benefit.  See *Green v. Ralee Engineering Co.*, 19 Cal.4th 66, 76 (1998) (internal citations omitted).

The cause of action is not limited to these situations, however; rather, it will lie "wherever the basis of the discharge contravenes a fundamental public policy." *Soules v. Cadam, Inc.*, 2 Cal.App.4th 390, 401 (1991).  The claimed public policy must be "tethered to" a specific constitutional or statutory provision. *Green*, 19 Cal.4th at 76.  Additionally, "in order to provide an exception to section 2922's at-will mandate, the policy must be public in that it affects society at large rather than the individual, must have been articulated at the time of discharge, and must be fundamental and substantial." *Id.* (internal citations and quotation marks omitted).  "This limitation recognizes an employer's general discretion to discharge an at-will employee without cause under section 2922, and best serves the Legislature's goal to give law-abiding employers broad discretion in making managerial decisions." *Id.* at 79-80.

The complaint identifies three primary reasons for plaintiff's termination that allegedly violated public policy: (1) plaintiff's complaints about "wage issues"; (2) his complaints about Regis' continuing education policies; and (3) his physical disability and Regis' desire not to accommodate him.[145]

---

[145]SAC, ¶ 34.

### 1. Wrongful Termination on the Basis of Disability

Plaintiff's wrongful termination claim survives summary judgment because he has raised triable issues of fact as to whether he was terminated on the basis of his disability. A plaintiff's failure to establish a *prima facie* case of discrimination under FEHA disposes of a wrongful termination claim based on such discrimination. See, e.g., *DeHorney v. Bank of Am. Nat'l Trust & Savings Assoc.*, 879 F.2d 459, 465 (9th Cir. 1989) (affirming summary judgment on plaintiff's her wrongful discharge claim because she failed to prove a *prima facie* case of race discrimination under 42 U.S.C. § 1981 and her wrongful termination claim was based on the same conduct); see also *Foley-Eckhart v. Richard-Allan Med. Indus., Inc.*, No. CV 95-0818 DT (AJWx), 1995 WL 861589, *13 (C.D. Cal. Nov. 13, 1995) ("For the same reasons set forth . . . in Plaintiff's Fifth Cause of Action for age discrimination, this Court finds that RAMI is entitled to summary judgment on the issue of wrongful discharge in violation of public policy").

The converse is also true; if a plaintiff raises triable issues regarding a defendant's violation of FEHA, he also survives summary judgment on a common law wrongful discharge claim. See *Ross v. San Francisco Bay Area Rapid Transit Dist.*, 146 Cal.App.4th 1507, 1515 (2007) ("FEHA's general prohibition against age discrimination in employment has been held to be sufficiently substantial to support a . . . claim for wrongful termination, and . . . disability discrimination can form the basis of a common law wrongful discharge claim against a public agency"). Jacobson adduced sufficient evidence to establish a *prima facie* case of discriminatory termination. He also raised triable issues of fact as to whether defendant's stated reason for discharging him was pretextual. Therefore, the court denies defendant's motion for summary judgment on plaintiff's claim for wrongful termination on the basis of disability in violation of public policy.

### 2. Wrongful Termination for Complaints Regarding "Wage Issues" and Continuing Education Policies

Plaintiff has proffered evidence that Carlton required its employees to take technique and

styling classes from the company and pay for them out of wages.[146]  He asserts he told his supervisors he did not want to take the classes "because they were so expensive and because [he] did not believe [he] was benefitting from them."[147]  When he communicated this objection to James O'Regan, Carlton's president, O'Regan purportedly said: "You are an idiot. You are a loser. You disrespect this company. You are setting a terrible example for other stylists [by] not taking these classes.  How dare you question our classes?  How dare you question our policy?  I will have you fired in no time."[148]

Plaintiff has also proffered evidence that throughout 2007 and 2008, Trailor and Armstrong discussed his refusal to take the required classes "[a]t least once a week."[149]  Plaintiff contends he "was told very specifically that [he would] get fired if [he] wouldn't take those classes."[150]  He "was told verbally by [Trailor] and by [Armstrong]," and received a "write-up . . . stat[ing] that, 'The deadline for taking a class has passed, and Sam hasn't taken that class yet . . . . Continuing to do so will lead to being fired."[151]

Plaintiff asserts that in the "later part of 2009," he "started writing letters . . . asking [people at Carlton] to stop treating [him] the way they were treating [him]."[152]  He testified that he gave the letters to Trailor, faxed them to the salon, faxed them to headquarters, emailed them to Trailor, and emailed them to Carlton's general email box.[153]  While he did not specify the contents of the letters, plaintiff testified that he believed he was terminated

---

[146]Jacobson Decl., ¶¶ 10-11.

[147]Id., ¶ 10; Jacobson Depo. at 117:14-25.

[148]Id. at 126:12-18.

[149]Id. at 140:17-142:19.

[150]Id.

[151]Id.

[152]Id. at 178:18-179:20.

[153]Id. at 178:6-15.

"for several reasons . . . [including] complaining about wages, complaining about not getting breaks, complaining about . . . [the Century City salon's practice of] manipulat[ing] the clock . . . – when you would come in, they clock you in, and what they would do is no one – no one – no one was allowed to touch the computer, only the front desk people. So the front desk people would clock you in and out. A lot of time those hours wouldn't be correct, and I would complain about that, or I would complain about coming to meetings on my days off and not getting paid for those meetings."[154]

From this testimony, a reasonable jury could conclude that plaintiff made formal complaints regarding his wages, breaks, and time card manipulation.

As noted, California law recognizes a claim for wrongful termination in violation of a public policy reflected in a statute or constitutional provision. *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 172 (1980) ("In a series of cases arising out of a variety of factual settings in which a discharge clearly violated an express statutory objective or undermined a firmly established principle of public policy, courts have recognized that an employer's traditional broad authority to discharge an at-will employee 'may be limited by statute . . . or by considerations of public policy'" (citations omitted)); see also *Kelly v. Methodist Hospital of Southern California*, 22 Cal.4th 1108, 1112 (2000) ("*Tameny* claims permit wrongful termination damages when a termination is undertaken in violation of a fundamental, substantial and well-established public policy of state law grounded in a statute or constitutional provision"); *Gantt v. Sentry Insurance*, 1 Cal.4th 1083, 1094-95 (1992) (same), disapproved on other grounds in *Green v. Ralee Engineering Co.*, 19 Cal.4th 66 (1998).

Plaintiff bears the burden of identifying the specific statute(s) or constitutional provision(s) on which he bases his *Tameny* claim. *Green*, 19 Cal.4th at 83 ("[I]n wrongful termination cases we have rejected public policy claims that were 'largely unaccompanied by citations to specific statutory or constitutional provisions.' We observed that the omission 'puts [the defendant] and

---

[154]*Id.* at 180:11-181:1.

the court in the position of having to guess at the nature of the public policies involved, if any. This kind of showing is plainly insufficient to create an issue of *material* fact justifying a trial on the merits of [the plaintiff's] claims,'" quoting *Turner v. Anheuser-Busch, Inc.*, 7 Cal.4th 1238, 1257 (1994) (affirming the entry of summary judgment on a wrongful termination claim premised on vague references to "the Alcohol, Tobacco and Firearms laws")); *Harrison v. Comcast*, No. C-04-4880 VRW, 2006 WL 2734322, *5 (N.D. Cal. Sept. 25, 2006) ("Harrison was represented by counsel when his complaint was filed. And yet his complaint does not identify any specific statutory or constitutional provision that would be undermined by his termination. Although Harrison alleges that his termination is against 'the public policy prohibiting retaliatory termination for exercising an employee's legal rights,' he fails to identify what those legal rights are"); *Woodall v. Asset Marketing Systems Ins. Services, LLC*, No. D048578, 2008 WL 162970, *4 (Cal.App. Jan. 18, 2008) ("We recognize that . . . Woodall's counsel periodically referenced amorphous concepts of potentially applicable public policy to support her claim, asserting, for example, that AMS's actions were 'fraudulent' and could potentially have led to financial 'elder abuse.' These vague assertions, however, without any citation to specific statutory, regulatory or constitutional provisions and devoid of any analysis as to how AMS's actions could be found by a 'reasonable trier of fact' to violate the (unstated) provisions, are insufficient at the summary judgment stage");[155] *Mello v. OMYA (California), Inc.*, No. E033951, 2004 WL 1879871, *3 (Cal.App. Aug. 24, 2004) ("OMYA pointed out that Mello's complaint did not identify any statutory or constitutional provision that formed the basis for his claim. Instead, it merely identified 'a fundamental policy interest in providing employees with a work place environment free from illicit and wrongful fabrications made by their employers.' Such vague statements, untethered to any specifically named provision are insufficient to survive summary judgment").

---

[155]"Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05-313 VRW, 2005 WL 2893865, *3 (N.D. Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

In the complaint, plaintiff alleges that his wrongful discharge claim is based on "fundamental public policies support[ing] the[ ] . . . categories of protected activity" he enumerates.[156] The assertion is "unaccompanied by citations to specific statutory or constitutional provisions." *Green*, 19 Cal.4th at 83. The *Green* Court stated that a plaintiff's failure to plead "citations to specific statutory or constitutional provisions" in the complaint is not fatal, however, so long as plaintiff identifies them at a later time, such as in opposition to a summary judgment motion. *Id.* at 84 ("Defendant did not argue in the Court of Appeal that plaintiff should have specified the statutory basis for his claim in his complaint, and the court did not address that issue. The court considered defendant's claim that plaintiff failed to produce the appropriate statutes or regulations to support his action at the summary judgment stage, but concluded that plaintiff had adequately identified several relevant FAA regulations as part of his opposition to summary judgment. Thus, the Court of Appeal properly held that plaintiff had met his burden to provide the specific statutes and regulations on which he based his claim."); *id.* at 83 n. 7 ("Defendant observes that *Turner* suggests plaintiffs should specify the statutory provisions on which they rely no later than at the summary judgment stage. As noted, the Court of Appeal did find that plaintiff adequately identified the statutes and regulations supporting his public policy claim in his opposition to defendant's summary judgment motion. Accordingly, we need not decide here the precise time at which a plaintiff must identify the particular statutes forming the basis of a *Tameny* claim. Clearly, a claim that does not identify the basis of its wrongful termination allegations will not prevail on summary judgment"). Like his complaint, plaintiff's opposition to defendant's motion for summary judgment is devoid of references to statutory authority supporting his claim that complaints about Regis' continuing education policy violation the constitution or a statute. He does, however, cite *Grant-Burton v. Covenant Care, Inc.*, 99 Cal.App.4th 1361, 1377 (2002), which held that an employee's discharge violated California Labor Code § 232, a statute that "prohibit[s] an employer from firing an employee for discussing the amount of their wages." See CAL. LABOR CODE § 232 ("[n]o employer may . . . [d]ischarge, formally discipline, or otherwise

---

[156]SAC, ¶ 35.

61

discriminate against an employee who discloses the amount of his or her wages"); *Grant-Burton*, 99 Cal.App.4th at 1376-77 ("The very purpose of the statute is to protect employees who want to discuss some aspect of their compensation, for example, a possible increase in pay, perceived disparities in pay, or the awarding of bonuses"). Plaintiff has neither alleged nor proffered evidence that he was discharged for discussing the amount of his wages; thus his citation to § 232 is unavailing. As plaintiff's sole "citation[ ] to specific statutory" is unrelated to his claims, his "showing is plainly insufficient to create an issue of *material* fact justifying a trial on the merits of [the plaintiff's] claims." *Green*, 19 Cal.4th at 83. Regis is thus entitled to summary judgment on plaintiff's claim for wrongful discharge in violation of public policy on the basis of his complaints regarding "wage issues" and Regis' continuing education policies.[157]

## I.     Whether Regis is Entitled to Summary Judgment on Plaintiff's Sixth Claim under for Discrimination and Retaliation for Taking CFRA and FMLA Leave

Regis has moved for summary judgment on plaintiff's sixth claim because it contends there is no causal connection between plaintiff's medical leave and his termination. The court first notes that plaintiff's opposition is entirely devoid of references to the FMLA. His single reference to the CFRA appears to be unrelated to his claim asserting discrimination and retaliation for taking medical leave. By failing to include any argument regarding these claims, plaintiff has abandoned them. See, e.g., *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (holding that a plaintiff "'abandoned . . . claims by not raising them in opposition to [defendant's] motion for summary

---

[157]While plaintiff's wrongful termination claim based on disability similarly does not cite the statutory authority on which plaintiff relies, courts have been more lenient where plaintiff alleges FEHA violations elsewhere in his complaint. See *Bruin v. Mills College*, No. C 06-05209 WHA, 2007 WL 419783, *6 (N.D. Cal. Feb. 6, 2007) (plaintiff's reference to "violation[s] of California's public policy forbidding unlawful discrimination and retaliation" was sufficient under *Turner* to place defendant on notice of the basis of the claim for wrongful termination in violation of public policy claim, as plaintiff had asserted a FEHA claim elsewhere in the complaint). Consequently, to the extent plaintiff's wrongful termination claim is based on disability discrimination, defendant received sufficient notice of the statutory basis for the claim such that "the omission" does not "put[ ] [the defendant] and the court in the position of having to guess at the nature of the public policies involved." *Green*, 19 Cal.4th at 83. Defendant is thus not entitled to summary judgment on this aspect of the wrongful termination claim.

judgment,'" quoting *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n. 4 (9th Cir. 2005) (alteration original)); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n. 2 (7th Cir. 1996) ("Bombard's complaint also alleged that FWN violated the Family and Medical Leave Act. . . . Bombard abandoned his FMLA claim after failing to respond to the FMLA arguments in FWN's motion for summary judgment"). Even were the court to consider the merits of plaintiff's FMLA and CFRA claims, however, it would conclude that defendant was entitled to have summary judgment entered in its favor.

"Congress enacted the [FMLA] to allow workers flexibility in scheduling time off to deal with family and medical problems and alleviate some of the tension created by the competing demands of work and family in modern society." *Scamihorn v. General Truck Drivers*, 282 F.3d 1078, 1082 (9th Cir. 2002). The FMLA entitles employees to twelve weeks of leave from their employment "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." They are also entitled to leave if they themselves have "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(C)-(D).

Like the FMLA, the CFRA, California Government Code § 12945.2, addresses the need of employees to balance work and family, and entitles employees to "[l]eave to care for a parent or a spouse who has a serious health condition," or to address "an employee's own serious health condition that makes the employee unable to perform the functions of the position of that employee. . . ." CAL. GOV'T CODE § 12945.2 (c)(3)(B)-(C).[158]

The FMLA "creates two interrelated, substantive employee rights: first, the employee has

---

[158]"Since CFRA adopts the language of the FMLA and California state courts have held that the same standards apply, [the court] refer[s] to FMLA leave only for the remainder of this opinion with the understanding that CFRA leave is also included." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 n. 4 (9th Cir. 2003) (citing *Dudley v. Dep't of Transp.*, 90 Cal.App.4th 255, 261 (2001); *Pang v. Beverly Hospital, Inc.*, 79 Cal.App.4th 986, 993 (2000); and *Moreau v. Air France*, No. C-99-4645 VRW, 2002 WL 500779, *1 (N.D. Cal. Mar. 25, 2002) (discussing an FMLA claim only because the CFRA and FMLA are "substantively identical"), aff'd, 343 F.3d 1179 (9th Cir.2003)).

a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001). To ensure that these minimum standards for leave were effectuated, "Congress made it unlawful for an employer to 'interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided' by the Act." *Id.* (citing 29 U.S.C. § 2615(a)(1)). This prohibition recognizes that attaching negative consequences to an employee's exercise of medical leave rights "tends to chill" the employee's willingness to exercise those rights. *Id.* at 1124. Employers are thus prohibited from weighing the exercise of FMLA rights as a negative factor in employment actions. *Id.* at 1125; 29 C.F.R. § 825.220(c).[159]

To prevail on such a claim, plaintiff need only establish, by a preponderance of the evidence, that (1) he took FMLA-protected leave; (2) he suffered adverse employment action; and (3) the adverse action was causally related to his FMLA leave. *Bachelder*, 259 F.3d at 1125. See also *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1096 (9th Cir. 2007) (upholding a jury instruction stating that "[i]n order for the plaintiff to establish a violation of the FMLA, she must prove all of the following elements by a preponderance of the evidence: (1) plaintiff was eligible for leave under the Family Medical Leave Act; (2) plaintiff had a bipolar condition and it constituted a 'serious health condition;' (3) plaintiff gave defendant appropriate notice of her need

---

[159]Other provisions of the FMLA prohibit discrimination "against any individual for opposing any practice made unlawful by this subchapter" (29 U.S.C. § 2615(a)(2)) and discrimination against any individual for instituting or participating in FMLA proceedings or inquiries (*id.*, § 2615(b)). See *Bachelder*, 259 F.3d at 1124 (denominating these provisions the "anti-discrimination" and "anti-retaliation" provisions of the act). While plaintiff has labeled his FMLA/CFRA claim as a claim for discrimination and retaliation under those statutes, the court construes it as a claim falling under the FMLA's prohibition against interference with the exercise of rights, given the *Bachelder* court's observation that "[b]y their plain meaning, the anti-retaliation or anti-discrimination provisions do not cover visiting negative consequences on an employee simply because he has used FMLA leave. Such action is, instead, covered under § 2615(a)(1), the provision governing 'Interference [with the] Exercise of rights.'" *Id.* Plaintiff contends he was subjected to adverse employment action because he took FMLA and/or CFRA leave. Thus, his claim is one for interference rather than discrimination or retaliation.

The *McDonnell Douglas* burden-shifting framework applies to claims for retaliation and/or discrimination but is inapplicable to FMLA interference claims. *Id.* at 1125.

to be absent from work; and (4) [p]laintiff's FMLA leave was a negative factor in defendant's decision to terminate her").

It is undisputed that plaintiff was terminated a month after he had been placed on medical leave. This timing is the only evidence plaiIntiff has adduced in support of his FMLA claim. Temporal proximity can be evidence of a causal relationship between the exercise of rights under the FMLA and adverse employment action. See *Satterlee v. Allen Press, Inc.*, 274 Fed. Appx. 642 910th Cir. Apr. 17, 2008) (Unpub. Disp.) ("'[P]rotected conduct [under the FMLA] closely followed by an adverse action" may be evidence of causation, citing *Marx v. Schnuck Markets*, 76 F.3d 324, 329 (10th Cir. 1996)). Temporal proximity alone, however, is not sufficient to raise triable issues of fact regarding interference with the exercise of rights under the FMLA. See *Zsenyuk v. City of Carson*, 99 Fed. Appx. 794, 796 (9th Cir. May 21, 2004) (Unpub. Disp.) ("Zsenyuk has not met his burden of establishing a genuine issue on causation. He presented no direct evidence of causation, and the only circumstantial evidence offered is the temporal proximity between his assertion of FMLA rights and the first three instances of alleged interference listed in his complaint. . . . Zsenyuk presented no other evidence that the other adverse actions were causally connected to his FMLA leave in late 1998, instead of being the legitimate disciplinary actions. . . . We conclude that the district court properly granted summary judgment to the City, because Zsenyuk failed to demonstrate that material issues of fact exist on the question of causation"); see also *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001) (""[S]uch temporal proximity  is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual"); *Carey v. ODW Logistics Inc.*, No. C2-08-CV-0581, 2010 WL 596503, *4 (S.D. Ohio Feb. 16, 2010) ("The only evidence that Carey has put forth in support of his claim of FMLA interference is that there was temporal proximity (somewhere between a week and a few days) between his FMLA leave request for shoulder surgery and his termination. Carey provides no other evidence to support his argument. . . . Without more, there is no genuine issue of material fact as to whether Dist-Trans used Carey's FMLA leave request in his termination").

This is particularly true here, where it is undisputed that defendant granted plaintiff's

request for three weeks of medical leave after his back surgery, and that plaintiff did not request further leave after he returned. Rather, it was Regis that placed plaintiff on medical leave a second time, after receiving medical documentation stating that he could not bend or twist.[160]

Regis has proffered evidence that plaintiff was under contract and employed by another hair salon while on medical leave. Since plaintiff adduces no evidence that Regis sought to interfere with his exercise of rights under the FMLA other than the fact that he was terminated one month after being placed on medical leave that he did not request, no reasonable juror could find that Regis considered plaintiff's use of protected medical leave as a negative factor in its decision to terminate his employment. Defendant is thus entitled to have summary judgment entered in its favor on plaintiff's FMLA and CRLA claims.

## J. Whether Regis is Entitled to Summary Judgment on Plaintiff's Prayer for Punitive Damages

Plaintiff has demanded punitive damages for the violations alleged in his third, fourth, fifth, and sixth causes of action. To obtain punitive damages, Jacobson must prove "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice[.]" CAL.

---

[160]Plaintiff cannot assert a claim under the FMLA based on Regis' decision to place him on leave involuntarily. See *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 448-49 (6th Cir. 2007) ("Wysong also made a claim under an 'involuntary-leave theory,' alleging that Dow violated her FMLA rights by forcing her to take her last three days of FMLA leave when she did not need to do so. . . . An involuntary-leave claim is really a type of interference claim. An employee may have a claim under § 2615(a)(1) when an employer forces an employee to take FMLA leave when the employee does not have a 'serious health condition' that precludes her from working. However, the employee's claim ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past" (citations omitted)); *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 174-75 (2d Cir. 2006) ("Sista argues that he was 'involuntarily' placed on FMLA leave, in violation of his rights under that act. . . . The FMLA says nothing about an employer's ability to 'force' an employee to take such leave, and such forced leave, by itself, does not violate any right provided by the FMLA. The FMLA does not create a right to be free from suspension with or without pay . . . which is the crux of Sista's claim here. If Sista were able to demonstrate that such a forced leave interfered with, restrained, or denied the exercise or attempted exercise of a right provided under the FMLA, a cause of action might lie. Under the circumstances of this case, Sista has not demonstrated an impingement on any FMLA right and, therefore, has not stated a cause of action under the FMLA").

CIV. CODE § 3294(a).  Section 3294(b) provides that

> "[a]n employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice.  With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation."

To obtain punitive damages from Regis, therefore, plaintiff must prove by clear and convincing evidence than "an officer, director, or managing agent of the corporation" authorized, ratified, or was personally engaged in acts of oppression, fraud, or malice.  See *Cruz v. HomeBase*, 83 Cal.App.4th 160, 167 (2000) ("By so confining liability, the statute avoids punishing the corporation for malice of low-level employees which does not reflect the corporate 'state of mind' or the intentions of corporate leaders.  This assures that punishment is imposed only if the corporation can be fairly be viewed as guilty of the evil intent sought to be punished.  '[T]o award [punitive] damages against the master for the criminality of the servant is to punish a man for that of which he is not guilty'" (citations omitted)).

Regis contends that plaintiff has failed to adduce evidence of any acts by a Regis officer, director, or managing agent that would provide a basis for the imposition of punitive damages.  Plaintiff counters that Regis can be held liable for punitive damages because O'Regan ratified Trailor's and Armstrong's conduct on numerous occasions.  Plaintiff has proffered evidence that he made formal and informal complaints to O'Regan regarding Trailor's and Armstrong's conduct, and that O'Regan took no action.  Under California law, this is sufficient to find that Trailor's and Armstrong's acts were ratified by O'Regan.  See *Murillo v. Rite Stuff Foods*, 65 Cal.App.4th 833, 852 (1998) ("A principal is liable when it ratifies an originally unauthorized tort.  The failure to discharge an agent or employee may be evidence of ratification.  As noted in *McChristian v.*

*Popkin* (1946) 75 Cal.App.2d 249, 256, 'If the employer, after knowledge of or opportunity to learn of the agent's misconduct, continues the wrongdoer in service, the employer may become an abettor and may make himself liable in punitive damages'").

There is insufficient evidence, however, for a jury to find that O'Regan was a managing agent of Regis such that Regis can be held be liable for punitive damages as a result of O'Regan's ratification of Trailor's and Armstong's conduct. Plaintiff contends that as President of Carlton Hair, Regan was undoubtedly a managing agent of Regis. "Whether 'a supervisor is a managing agent within the meaning of Civil Code section 3294 does not necessarily hinge on their level in the corporate hierarchy,'" however. *Muniz v. United Parcel Service, Inc.*, __ F.Supp.2d __, 2010 WL 2836854, *14 (N.D. Cal. July 16, 2010) (citing *Myers v. Trendwest Resorts, Inc.*, 148 Cal.App.4th 1403, 1437 (2007)). "Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy." *Id.* See also *White v. Ultramar, Inc.*, 21 Cal.4th 563, 573 (1999) (defining managing agents as "those employees who exercise substantial independent authority and judgment over decisions that ultimately determine corporate policy").

O'Regan testified that he is "very much involved with Carlton's policies."[161] O'Regan's testimony, however, does not demonstrate that he is involved in setting policy for Regis. When asked whether he "represent[ ] Carlton in corporate decision making for Regis[,]" O'Regan testified that he "report[s] to a gentleman called Andy Cohen, who is the president of Regis Salons," and that he consults with Cohen regarding "policies and procedures for Carlton."[162] This testimony does not conclusively indicate that O'Regan has authority to set policy for the 32 salons within the operating division known as Carlton, much less that he has discretion to set policy for the parent company, Regis.

In *Roby v. McKesson Corp.*, 47 Cal.4th 686 (2009), the California Supreme Court recently revisited the kind of conduct that constitutes discretionary authority over corporate policy. It noted

---

[161]O'Regan Depo at 11:18-21.

[162]*Id.* at 12:3-19.

that "[w]hen [it] spoke in *White* about persons having 'discretionary authority over . . . corporate policy', [it was] referring to formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership. *It is this sort of broad authority that justifies punishing an entire company* for an otherwise isolated act of oppression, fraud, or malice." *Roby*, 47 Cal.4th at 715 (emphasis added); see also *Cruz*, 83 Cal.App.4th at 167-68 ("By analogy to these definitions, 'corporate policy' is the general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations. A 'managing agent' is one with substantial authority over decisions that set these general principles and rules").

O'Regan's statement that he has the power to "make decisions" regarding "basic issue[ ]s" and to hire or fire Carlton employees without consulting Regis[163] does not support a finding that he sets "formal policies that affect a substantial portion of the company." *Roby*, 47 Cal.4th at 715. See *Muniz*, 2010 WL 2836854 at *14 (finding that an operations manager who was "in charge of 6 divisions, 23 package centers and approximately 40 managers, 150 supervisors and 4,200 employees" was not a managing agent for the parent corporation because he did not set policy for the parent); *Gelfo*, 140 Cal.App.4th at 63 (concluding that there was insufficient evidence from which to find that a Lockheed Martin vice president was a managing agent for the corporation because "[n]o evidence was presented regarding MacPherson's duties or authority" within Lockheed); see also *White*, 21 Cal.4th 577 (stating, in dicta, that "Salla's supervision of plaintiff and her ability to fire him alone were insufficient to make her a managing agent").

This is particularly true given O'Regan's testimony that he would consult with Cohen regarding Carlton policies and procedures.[164] If, as the President of Carlton, O'Regan did not have sufficient discretion to set policy for *Carlton* without consulting Cohen, no jury could find by clear and convincing evidence that he was in a position to set policy for *Regis*. The court thus grants Regis' motion for summary judgment on plaintiff's prayer for punitive damages as respects all

---

[163]*Id.* at 12:18-24.

[164]*Id.* at 12:13-16 ("Q: Do you work with [Cohen] to create policies and procedures for Carlton? A: We will consult if there's anything of any – if there's a need, we will consult").

1 causes of action challenged in the motion for summary judgment.

2      Plaintiff contends that the court cannot grant summary judgment on his prayer for punitive

3 damages as respects his FEHA harassment claims because Regis' motion does not "completely

4 dispose[ ] of" these claims. See CAL. CODE CIV. PROC. § 437c(f)(1). Plaintiff is correct that Regis

5 did not move for summary judgment on his FEHA harassment claims. As a result, the court

6 cannot assume that the evidence plaintiff adduced in opposition to the motion comprises the entirety

7 of the evidence he could offer regarding acts of harassment by Regis' officers, directors or

8 managing agents, or ratification of subordinates' harassment by Regis' officers, directors or

9 managing agents. Defendants' motion for summary judgment on plaintiff's punitive damages

10 prayer on the harassment claims is therefore denied.

11

12 ### III. CONCLUSION

13      For the reasons stated, the court grants Regis' motion for summary judgment on plaintiff's

14 (1) FEHA retaliation claims; (2) claim for wrongful termination in violation of public policy based

15 on complaints regarding "wage issues" and Regis' continuing education policy; (3) violation of the

16 CFRA and the FMLA; and (4) prayer for punitive damages on any claim as to which Regis sought

17 summary judgment. The court denies the motion as to all other claims.

18

19 DATED: January 31, 2011

20                             MARGARET M. MORROW
                        UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28